# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN FOREST RESOURCE COUNCIL**, 700 N.E. Multnomah Street, Suite 320, Portland, OR 97232; **ASSOCIATION OF O&C COUNTIES**, 16289 Hwy. 101 South, Suite A, Brookings, OR 97415; **DOUGLAS COUNTY, OREGON**,1036 S.E. Douglas Avenue, Roseburg, OR 97470; **LEWIS COUNTY**, **WASHINGTON**, 345 W. Main Street, Chehalis, WA 98532; **SISKIYOU COUNTY**, **CALIFORNIA**, P.O. Box 750, 1312 Fairlane Road, Yreka, CA 96097; and **SKAMANIA COUNTY**, **WASHINGTON**, 240 NW Vancouver Avenue, Stevenson, WA 98648, | Civil Case No. __ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Plaintiffs*, | |
| v. | |
| **UNITED STATES FISH AND WILDLIFE SERVICE**, 1849 C Street NW, Washington, DC 20240; **DOUG BURGUM**, *in his official capacity as U.S. Secretary of the Interior*, 1849 C Street NW, Washington, D.C. 20240, | |
| *Defendants*. | |

## INTRODUCTION

1.      This case is about an agency ignoring the law, readily available scientific and economic data, and a binding settlement agreement to advance flawed policy preferences over sound species protection, causing devastating harm to rural, timber-dependent communities in the Pacific Northwest. Plaintiffs American Forest Resource Council, the Association of O&C Counties, Douglas County, Lewis County, Siskiyou County, and Skamania County (collectively, "Plaintiffs") challenge the U.S. Fish and Wildlife Service's ("Service") latest designation of critical habitat for the Northern Spotted Owl ("Owl"), Endangered and Threatened Wildlife and

Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl, 86 Fed. Reg. 62,606 (Nov. 10, 2021) ("November 2021 Rule"). Following a change of Presidential administration, the Service issued the November 2021 Rule to withdraw a rule it had issued months earlier, pursuant to a settlement agreement approved by this Court, to exclude about 3.5 million acres from the Owl's critical habitat designation, for a total of 6,105,279 acres. *See* Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl, 86 Fed. Reg. 4,820 (Jan. 15, 2021) ("January 2021 Rule"). The November 2021 Rule instead sweepingly designates *9,373,676 acres* as critical habitat for the Owl, an area roughly twice the size of New Jersey. This critical habitat designation places "a huge swath of forest lands in the Pacific Northwest . . . substantially off-limits for timber harvesting" and other active forest management, *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 2 (D.C. Cir. 2017) (Kavanaugh, J.). By doing so, the November 2021 Rule severely harms communities and businesses that depend on sustainable timber harvests from the designated lands, including Plaintiffs; deepens the country's reliance on wood imported from abroad; and significantly increases fuel loads and thus the risk of catastrophic fires, harming both the Owl and public safety.

2.      Plaintiffs bring this action to enforce requirements of the Endangered Species Act ("ESA") and Administrative Procedure Act ("APA") that the Service violated in brushing aside the January 2021 Rule and instead designating a far vaster area as critical habitat for the Owl. The November 2021 Rule is arbitrary, capricious, and unlawful for numerous reasons. Among others, the Rule:

    a.   fails to use the best scientific and commercial data available, including critical data on forest conditions and barred owl encounter rates, and instead relies on the results of a flawed model developed over a decade ago run on obsolete inputs;

b.  refuses to apply the applicable regulatory definition of habitat, designates as critical habitat millions of acres that are not currently habitat for the Owl, and fails to justify designating areas that were not occupied by the Owl at the time the species was listed under the ESA;

c.  fails to comply with the ESA's economic analysis requirement;

d.  fails to evaluate excluding several areas identified in public comments from the designation and misinterprets the ESA in finding that areas could not be excluded consistent with section 4(b)(2) of the ESA;

e.  wrongly assumes that the January 2021 Rule never excluded 3.5 million acres from the Owl's critical habitat designation and thus the Service was only excluding areas from designation in issuing the November 2021 Rule; and

f.  violates the settlement agreement between the Service and Plaintiffs in a case challenging the Service's 2012 critical habitat designation for the Owl.

3.  For these reasons, the November 2021 Rule should be declared unlawful and vacated, and the January 2021 Rule should be declared reinstated.

## PARTIES

4.  **Plaintiff American Forest Resource Council** ("AFRC"), a nonprofit corporation organized under the laws of the state of Oregon, is a forest products trade association headquartered in Portland, Oregon that represents approximately 50 lumber and plywood manufacturing companies, landowners, and counties throughout the states of Washington, Oregon, California, Idaho, Montana, and Nevada. Many of AFRC's members depend on a reliable and sustainable supply of timber sold by the national forests in Washington, Oregon, and California, and U.S. Bureau of Land Management ("BLM") districts in Oregon that are located within the geographic

range of the Owl, and have suffered significant harm because of the designation of millions of acres of federal forests as critical habitat for the Owl.

5.      AFRC and many of its members have a deep and continuing interest in the Service's decisions relating to the conservation of the Owl. Measures for the conservation of the Owl have harmed and continue to harm the business, environmental, and procedural interests of AFRC and its members. AFRC has participated in every decision-making process by the Service relating to the Owl since formed in 2001 and has played a key role in Service actions regarding Owl conservation actions for many years.

6.      In recent years, restrictions and delays in land management activities by the U.S. Forest Service ("Forest Service") and BLM from measures related to conservation of the Owl have greatly reduced the availability of Forest Service and BLM timber for AFRC's members, adversely affecting their business operations. The November 2021 Rule designates three-quarters of the former "Matrix" under the Northwest Forest Plan, lands that were meant to be available for timber harvest. Consultation required by the designation of these areas has caused severe delays to forest management projects. During repeated, catastrophic wildfire seasons since 2020, for example, timber harvest and other fuel-reduction projects that had been delayed because of the critical habitat designation burned, resulting in irretrievable loss of both timber under contract and Owl habitat. Other projects have been delayed or cancelled as a direct result of the critical habitat designation, in many instances resulting in deterioration and loss of valuable timber. In addition, many of AFRC's members own private forest land within the range of the Owl that are managed to minimize losses from insects, disease, and wildfire but are adjacent to federal lands that are at high risk to wildlife and disease because timber is not actively managed on them due to Owl restrictions.

7.      **Plaintiff Association of O&C Counties** ("AOCC") is an association whose members are 15 counties in western Oregon containing "O&C Lands" subject to the Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act of 1937 ("O&C Act"), Pub. L. No. 75-405, 50 Stat. 874 (Aug. 28, 1937) (codified as 43 U.S.C. §§ 2601 *et seq.*), and managed by BLM ("O&C Counties"). AOCC's members include Klamath, Douglas, Curry, Coos, Clackamas, Lincoln, Linn, Polk, Yamhill, Marion, Columbia, Washington, Tillamook, Jackson, and Lane Counties. AOCC's sole function is to protect and enhance the O&C Counties' interest in the O&C Lands.

8.      AOCC's member counties are among the intended beneficiaries of the O&C Act. Under the O&C Act, AOCC's member counties have the right to 50 percent of gross receipts from timber sales and harvests on O&C Lands. 43 U.S.C. § 2605. As such, AOCC's members have a direct financial stake in the exclusion of O&C Lands from the designation of Owl Critical Habitat. The continued designation of the O&C Lands causes, and will continue to cause, immediate and direct financial harm to AOCC's member counties by hindering and in some instances preventing sustained yield timber production, thereby thwarting the purpose of the O&C Act. Continuing to include O&C Lands as designated critical habitat for the Owl will necessarily deprive the O&C Counties of receipts from timber sales that would otherwise be harvested on those lands each year. Failure to promptly exclude the O&C Lands from the critical habitat designation will also deprive the O&C Counties of timber supply that would support the wood products industries in those counties, resulting in increased levels of unemployment, as well as increased demand on certain services provided by the O&C Counties.

9.      The relief requested by AOCC will redress that harm by ensuring that the critical habitat designation for Owl does not prevent the Secretary of the Interior from managing O&C

Lands for the intended purpose of permanent forest production on a sustained yield basis. This relief will help ensure that AOCC's members receive the receipts from timber sales and thus improve the economic stability and development of the O&C Counties, as contemplated by the O&C Act.

10.    **Plaintiff Douglas County**, a political subdivision of the State of Oregon, is located in heavily forested southwestern Oregon and is home to approximately 110,000 residents. The County extends from sea level at the Pacific Ocean to 9,182-foot Mt. Thielsen in the Cascade Mountains. It contains nearly 2.8 million acres of commercial forest lands, including vast areas managed by the Forest Service and BLM, of which almost 728,000 acres are O&C lands. Over 50 percent of the land in the County is owned by the federal government and managed by the Forest Service or BLM. Douglas County enjoys the largest proportion of O&C lands of any county and is thus the largest beneficiary of gross timber sale receipts under the O&C Act.

11.    The ESA listing of the Owl and designation of critical habitat for the Owl has caused federal timber sales on O&C Lands to plummet, resulting in Douglas County suffering significant, negative socioeconomic impacts across all its rural communities. The human and environmental impacts have been drastic, far-reaching, and long-lasting. For Douglas County and other rural communities, the impacts have been particularly severe because of Congress's failure to reauthorize the Secure Rural Schools Program, which previously provided much-needed funds to counties whose timber-dependent economies are harmed by the Service's designation of critical habitat for the Owl. *See* Secure Rural Schools Reauthorization Act of 2023, S. 2581, 118th Cong. (passed by Senate Nov. 12, 2024, not passed by House); *see also* Anne A. Riddle, Cong. Rsch. Serv., R41303, The Secure Rural Schools and Community Self-Determination Act: Background and Issues 6 n.23 (2023) (noting that Secure Rural School payments are sometimes called "owl"

payments). Douglas County has commented on previous Owl critical habitat designations, including the 1992, 2012, and 2021 critical habitat rules.

12.    In its comments on the November 2021 Rule, Douglas County requested that all lands within Douglas County be excluded from being designated as critical habitat, due to the severe and disproportionate economic impacts that designation of these lands has on Douglas County. Alternatively, Douglas County requested that, at a minimum, all O&C Lands; Forest Service land designated as Matrix under the Northwest Forest Plan; unoccupied lands; and private, state, and county lands (both in Douglas County and statewide) should be excluded. The January 2021 Rule excluded most of the areas identified by Douglas County. The November 2021 Rule injures Douglas County by designating most of these areas, with the exception of 172,712 acres of O&C Lands, thus depriving Douglas County of receipts from timber sales promised by the O&C Act, as well as other socioeconomic benefits of excluding lands within the County.

13.    **Plaintiff Lewis County** is a municipal corporation of the State of Washington. More than 274,000 acres of designated critical habitat lie in federal land within Lewis County—18 percent of the entire county. This includes over 50,000 acres of Matrix lands designated for timber production under the Northwest Forest Plan. Under the November 2021 Rule, timber production is essentially disallowed on these lands. Since the listing of the Owl in 1990, the number of working lumber mills in Lewis County dropped from ten to only two by 2012. Employment in Lewis County has declined since 2007. In particular, the forestry jobs that once dominated the local economy are now rarer than jobs in almost all other sectors. Average wages in Lewis County decreased between 1969 and 2016 when adjusted for inflation. The local employment losses associated with these closures of lumber mills have contributed to tax base depletion and

exacerbated socioeconomic challenges, such as prolonged stagnation following the Great Recession.

14.     Lewis County also shares the White Pass Ski Area with a neighboring county. The Ski Area hosts approximately 125,000 visitors annually and serves as a tourism economic engine for the County. In 2012, the Service designated the White Pass Ski Area in total as critical habitat for the Owl, including slopes and manmade structures. While the January 2021 Rule excluded 50,000 acres of Matrix timber lands in Lewis County and the White Pass Ski Area from the designation, the November 2021 Rule again designates these areas.

15.     The exclusion of the White Pass Ski Area would permit the County to maintain its footprint and operations, resulting in economic benefits to Lewis County in terms of lodging tax dollars and tourism growth. Lewis County would similarly benefit from restored timber activity on the Matrix lands excluded by the January 2021 Rule but designated under the November 2021 Rule. The increased timber production capacity on these lands would provide an economic boost to Lewis County in the form of logging and milling jobs, plus the secondary benefits these jobs have on the local housing market and local retail, hospitality, and service industries. All these benefits would increase Lewis County's population and tax base and its citizens' quality of life. And, as with the other plaintiffs, the County will benefit from improved forest management, including due to reduced fire risk.

16.     **Plaintiff Skamania County** is a municipal corporation of the State of Washington. Over half of Skamania County—535,325 acres—is designated as critical habitat under the November 2021 Rule. Like the experience of neighboring Lewis County, the listing of the Owl and the 2012 critical habitat designation have economically devastated Skamania County, leading to the loss of timber mills and family-wage employment. Matrix lands in Skamania County lack

the essential features of habitat but nonetheless are designated as critical habitat under the November 2021 Rule. The January 2021 Rule excluded nearly 200,000 acres of Matrix timber lands that lie in Skamania County from the Owl's critical habitat designation, but the November 2021 Rule again designated these areas. Setting aside the November 2021 Rule would enable management of these areas for sustained timber production and reduce wildfire risk, thus benefiting the County's rural communities.

17.    **Plaintiff Siskiyou County** is a political subdivision of the State of California. More than 178,000 acres of federal land in Siskiyou County are designated as critical habitat under the November 2021 Rule. The designation of these lands as critical habitat for the Owl has reduced timber harvest volumes and inhibited effective fuels treatments in the County, thereby increasing the risk of catastrophic wildfire in the County. The increased wildfire threat due to the designation of timberland within the County as critical habitat places rural communities in the County at risk.

18.    The critical habitat designation also has reduced timber harvest taxes and ad valorem property taxes that Siskiyou County, which is economically disadvantaged, collects on adjacent lands. After the listing of the Owl under the ESA and designation of critical habitat for the species, annual timber harvest on federal lands in Siskiyou County declined by over 250 million board feet a year, and County employment related to wood manufacturing dropped by 36 percent. During this same time, Siskiyou County has witnessed a dramatic increase in the frequency and intensity of wildfires. Communities throughout the County are threatened by catastrophic wildfire on an annual basis. The January 2021 Rule excluded lands in Siskiyou County from designation as critical habitat for the Owl, but the November 2021 Rule again designated those lands, harming the County.

19.     The legal violations alleged in this Complaint have injured and continue to injure Plaintiffs' interests, and granting the relief requested in this lawsuit would redress these injuries.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.

21.     The November 2021 Rule is a final agency action subject to judicial review. 5 U.S.C. §§ 702, 704, 706.

22.     Venue in this district is proper because the Defendants have offices in this district, and a substantial portion of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(b)(2).

## LEGAL BACKGROUND

### A.     Administrative Procedure Act

23.     Under the APA, a reviewing court shall "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or that is "without observance of procedure required by law." *Id.* § 706(2)(D).

24.     The APA requires agencies to engage in a notice and public comment process prior to formulating, amending, or repealing a rule. *Id.* §§ 551(5), 553. This process is designed to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). The APA permits an agency to forego notice and comment requirements only if "good cause" exists that notice and comment is "impracticable,

unnecessary, or contrary to the public interest." *Id.* § 553(b)(B). The "good cause" exception is narrowly construed.

**B.    Endangered Species Act**

25.    Enacted in 1973, the ESA seeks to conserve species that are at risk of extinction. *See* 16 U.S.C. §§ 1531 *et seq*. The Act authorizes the Secretary of the Interior to list terrestrial species that are endangered or threatened. *See id.* § 1533. The Secretary has delegated ESA duties to the Service.

26.    When the Service lists a species as endangered or threatened, it must also "designate any habitat" of the species which is then considered to be critical habitat, unless doing so would not be "prudent." *Id.* § 1533(a)(3)(A)(i); 50 C.F.R. § 424.12(a). The Act defines "critical habitat" to include the "specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection," or the "specific areas outside the geographical area occupied by the species at the time it is listed" if such areas are determined to be "essential for the conservation of the species." 16 U.S.C. § 1532(5)(A)(i)-(ii).

27.    Under Section 4(b)(2) of the ESA, critical habitat designations may only be made "after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular area as critical habitat." *Id.* § 1533(b)(2). The Secretary may exclude an area from critical habitat upon determining that the benefits of such exclusion outweigh the benefits of designating such area as critical habitat, unless the Secretary determines, based on the best scientific data available, that the failure to designate such area as critical habitat will result in the extinction of the species. *Id.*

28.    Designation of land as critical habitat triggers certain consultation requirements under Section 7 of the ESA. Any federal agency seeking to authorize, fund, or carry out an action on designated land must first consult with the Service to ensure that the action is "not likely to . . . result in the destruction or adverse modification" of critical habitat. *Id.* § 1536(a)(2).

29.    Pursuant to the Supreme Court's holding in *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9 (2018), "Section 4(a)(3)(A)(i) does not authorize the Secretary [of the Interior] to designate [an] area as *critical* habitat unless it is also *habitat* for the species." *Id.* at 20 (citing 16 U.S.C. § 1533(a)(3)(A)(i)). In other words, "[o]nly the 'habitat' of [an] endangered species is eligible for designation as critical habitat," not areas that might develop into habitat in the future, even if the Service believes designation of such areas to be "essential for the conservation of the species." 586 U.S. at 20.

30.    ESA Section 4(b)(2) "imposes a categorical requirement that the Secretary tak[e] into consideration economic and other impacts before" designation of critical habitat. *Id.* at 24 (quotation marks omitted). To meet this requirement, the Service must "make available for public comment the draft economic analysis of [a proposed critical habitat designation]. The draft economic analysis will be summarized in the Federal Register notice of the proposed designation of critical habitat." 50 C.F.R. § 424.19(a).

## C.    Oregon and California Railroad and Coos Bay Wagon Road Grant Lands Act

31.    In the 1800s, Congress established a land grant to the Oregon and California Railroad Company in exchange for construction of a rail line from the Columbia River in Oregon to California. Administration of the grant was rife with fraud, leading Congress to authorize the Attorney General to seek reverter. *See Or. & Cal. R.R. Co. v. United States*, 238 U.S. 393 (1915). In 1916, Congress passed the Chamberlain-Ferris Revestment Act, which revested approximately

2.2 million acres of these O&C Lands back to the United States. A smaller amount of land—approximately 93,000 acres—associated with the Coos Bay Wagon Road was similarly revested by Congress in 1919, 40 Stat. 1179, and this land is subject to the same management requirements as O&C Lands.

32.     In 1937, Congress passed the O&C Act, 43 U.S.C. §§ 2601 *et seq.* The O&C Act provided for permanent forest production on a sustained-yield basis, which would lead to protection of watersheds and regulation of stream flow and contribute to the economic stability of local communities and the timber industry. The Act included provisions for reimbursing the counties in which O&C Lands are located for the loss of tax revenues from O&C Lands. The Act was a revolutionary moment in forest management, as it reflected a new philosophy applying forest science to enable timber supply at a constant level while ensuring renewal of the land and the resource.

33.     The O&C Act provides that O&C Lands "be classified as timberlands, and power-site lands valuable for timber [and] shall be managed . . . for permanent forest production, and the timber thereon shall be sold, cut, and removed in conformity with the princip[le] of sustained yield for the purpose of providing a permanent source of timber supply, protecting watersheds, regulating stream flow, and contributing to the economic stability of local communities and industries, and providing recreational facilities." *Id.* § 2601.

34.     Additionally, the Act provides that "[t]he annual productive capacity for such lands shall be determined and declared," and "timber from said lands in an amount not less than one-half billion feet board measure, or not less than the annual sustained yield capacity when the same has been determined and declared, shall be sold annually, or so much thereof as can be sold at reasonable prices on a normal market." *Id.*

35.    To provide a reliable stream of income to the O&C Counties, the O&C Act mandated that 50 percent of the gross revenues from timber sales on the O&C Lands be paid to the counties, *id.* § 2605(a), and that an additional 25 percent of the gross revenues from timber sales on the O&C Lands also be paid to the counties under certain conditions, *id.* § 2605(b). The remaining 25 percent of gross revenues would go to the government to cover the administrative cost of running the sale program. *Id.* § 2605(c).

36.    Most of the O&C Lands are presently administered by BLM. The O&C Act requires that BLM classify O&C Lands as timberlands and manage these lands for "permanent forest production" and that timber on the lands "be sold, cut, and removed in conformity with the princip[le] of sustained yield." *Id.* § 2601.

## FACTUAL BACKGROUND

37.    The Owl (*Strix occidentalis caurina*) is a medium-sized nocturnal bird that inhabits western coniferous forests from British Columbia to mid-California. In 1990, the Service listed the Owl as a threatened species under the ESA. 55 Fed. Reg. 26,114 (June 26, 1990). In 1992, the Service first designated 6.8 million acres as critical habitat for the Owl. 57 Fed. Reg. 1,796, 1,800-11 (Jan. 15, 1992). This included 2.2 million acres in Washington, 3.3 million acres in Oregon, and 1.4 million acres in California. *Id.*

38.    Since the Owl was listed as a threatened species, approximately 500 sawmills in the Pacific Coast region from the Canadian border to mid-California have been forced out of business, destroying over 33,000 mill jobs and thousands more beyond the mills. These mill closures, primarily a result of federal agency regulations intended to protect the Owl, have caused lasting economic harm to dozens of rural communities dependent on timber provided from federal land managed by the Forest Service and BLM.

39.     In 1993, President Clinton announced the Northwest Forest Plan as a "compromise" solution to the economic crisis created by the ESA listing of the Owl. The Secretaries of Agriculture and the Interior adopted the Northwest Forest Plan in 1994. The Northwest Forest Plan "introduced a system of reserves where conservation of late-successional forest, riparian habitats, northern spotted owls, and other species dependent on older forest would be the priority, *and matrix areas where timber harvest would be the goal*." 77 Fed. Reg. 71,876, 71,880 (Dec. 4, 2012) ("2012 Rule") (emphasis added); *see also* Record of Decision for Amendments to Forest Service and Bureau of Land Management Planning Documents Within the Range of the Northern Spotted Owl, at 7 (Apr. 13, 1994), *available at* https://www.fs.fed.us/r6/reo/library/downloads/documents/NWFP-ROD-1994.pdf.

40.     Under the Northwest Forest Plan, nearly 4 million acres, representing 16 percent of the federal forest land within the range of the Owl, were designated as Matrix lands to provide a steady supply of federal timber to the local timber-based economy. The original Matrix lands consisted of approximately 3.28 million acres of National Forests and just under 700,000 acres of BLM-administered lands.

41.     As a result of the Service's habitat designation, BLM, the Forest Service, and other agencies responsible for managing federal forest lands must consult with the Service to ensure that any action that they take—including approving the harvest of timber for sale or other forest management projects—will not result in destruction or "adverse modification" of designated critical habitat.

## A.     2008 Critical Habitat Designation

42.     In 2002, several groups challenged the 1992 critical habitat designation for the Owl. *See W. Council of Indus. Workers v. Sec'y of Interior*, Civ. No. 02-6100-AA (D. Or.). In 2003, the

Service settled the case by agreeing to complete a rulemaking to consider revising the Owl critical habitat.

43.    The Service published a revised critical habitat rule on August 13, 2008, which designated 5,312,300 acres of federal land as critical habitat, and issued a recovery plan for the Owl. 73 Fed. Reg. 47,326 ("2008 Rule").

44.    Several of the same plaintiffs who had challenged the 1992 designation again sued to overturn the 2008 critical habitat designation, as did environmental groups. *See Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126, 130 (D.D.C. 2010).

45.    In March 2009, the Service sought voluntary remand of the 2008 critical habitat designation and recovery plan, which the court granted. *Id*. The Service completed a new recovery plan in 2011.

**B.    2012 Critical Habitat Designation**

46.    In December 2012, the Service issued the 2012 Rule designating 9,577,969 acres of federal forest lands in California, Oregon, and Washington as critical habitat for the Owl, *over 4.25 million more acres* than designated by the 2008 Rule. 77 Fed. Reg. at 71,876.

47.    As Justice Kavanaugh explained in a case challenging the 2012 Rule, "[t]o put the agency's action in perspective, the designated critical habitat area is roughly twice the size of the State of New Jersey. For Easterners, imagine driving all the way up and then all the way back down the New Jersey Turnpike, and you will get a rough sense of the scope of the critical habitat designation here. The critical habitat designation means that a huge swath of forest lands in the Pacific Northwest will be substantially off-limits for timber harvesting." *Carpenters Indus. Council*, 854 F.3d at 2.

48.     When the Forest Service and BLM requested that the Service exclude about 1.5 million acres of sustained-yield timberlands, much of which are younger forests that were not Owl habitat, the Service refused. Of the over 9.5 million acres designated as critical habitat, more than 2.8 million acres were Matrix lands designated for timber production under the Northwest Forest Plan. This amounted to nearly 70 percent of all Matrix lands. In all, 75 percent of lands available for timber production were designated as critical habitat.

49.     In practice, because logging affects habitat, the critical habitat designation means that certain lands that were previously available as a source of timber became substantially unavailable. Indeed, the Service acknowledged in the 2012 Rule that "the critical habitat designation means that timber-harvesting activity on designated lands will be limited, and that 'traditional clearcutting' of timber will be disfavored." *Carpenters Indus. Council*, 854 F.3d at 3-4 (quoting 77 Fed. Reg. at 71,941). As the Forest Service later acknowledged, "timber production is no longer emphasized on much of the [Northwest Forest Plan] Matrix land because large areas of Matrix have been designated as critical habitat for the northern spotted owl." U.S. Dep't of Agric., Bioregional Assessment of Northwest Forests 60 (2020), *available at* https://www.fs.usda.gov/detail/r6/landmanagement/planning/?cid=FSEPRD677501.

50.     In early 2013, a coalition of counties, trade associations, and timber companies, including several of the Plaintiffs here, challenged the 2012 Rule. *Carpenters Indus. Council v. Salazar*, No. 1:13-cv-00361-RJL (D.D.C.). Three Washington counties, including Plaintiffs here, intervened as Plaintiffs.

51.     After the case was fully briefed on summary judgment, the district court dismissed it for lack of standing. *Carpenters Indus. Council v. Jewell*, 139 F. Supp. 3d 7 (D.D.C. 2015). Plaintiffs appealed the dismissal, and the D.C. Circuit reversed. The Court of Appeals found that

AFRC had "demonstrated a substantial probability that the critical habitat designation will cause a decrease in the supply of timber from the designated forest lands, that Council members obtain their timber from those forest lands, and that Council members will suffer economic harm as a result of the decrease in the timber supply from those forest lands." *Id.* at 3-4.

52.    In October 2018, after the parties completed summary judgment briefing on remand before the district court, the Supreme Court issued its decision in *Weyerhaeuser*, 586 U.S. 9 (2018). The Supreme Court unanimously ruled that "Section 4(a)(3)(A)(i) does not authorize the Secretary [of the Interior] to designate [an] area as *critical* habitat unless it is also *habitat* for the species." *Id*. at 20 (emphasis in original) (citing 16 U.S.C. § 1533(a)(3)(A)(i)). In other words, "[o]nly the 'habitat' of [an] endangered species is eligible for designation as critical habitat," not areas that might develop into habitat in the future, even if the Service believes designation of such areas to be "essential for the conservation of the species." 586 U.S. at 20. The Court also held that ESA Section 4(b)(2) "imposes a categorical requirement that the Secretary tak[e] into consideration economic and other impacts before" designation of critical habitat. *Id.* at 24 (quotation marks omitted).

53.    The plaintiffs moved for leave to file a supplemental brief addressing the Supreme Court's decision. Plaintiffs explained that the 2012 Rule was based on the Service's same unlawful view that the Agency could designate areas that are not currently suitable habitat if the Agency characterized the areas to be essential to the conservation of the species. Based on this error, the Service designated as critical habitat "areas anticipated to develop into suitable habitat in the future," 77 Fed. Reg. at 72,026, and "approximately 1.1 million acres" of Forest Service-managed Matrix lands designated for timber harvesting that were not currently habitat. *Id.* at 72,028. Plaintiffs also explained that the 2012 Rule failed to meet the ESA's

"categorical requirement that the Secretary tak[e] into consideration economic and other impacts before" designation of critical habitat. *Weyerhaeuser*, 586 U.S. at 24 (quotation marks omitted). The Service's Final Economic Analysis evaluating the proposed 2012 Rule did not consider a wide spectrum of economic effects resulting from reduced timber volume and instead erroneously viewed the world as if the federal government were the only economic actor that could suffer harmful impacts from a critical habitat designation by having to do more ESA Section 7 consultations. The Service also failed to address the economic benefits that would result from the Forest Service and BLM's requests that the Service exclude about 1.5 million acres of their sustained-yield timberlands, or consider excluding all O&C Act timberlands due to their economic importance and unique statutory purpose.

54.    After the plaintiffs filed their supplemental brief addressing *Weyerhaeuser*, the Service agreed to settle the case. On April 26, 2020, the district court approved the stipulated Settlement Agreement. *Pac. Nw. Reg'l Council of Carpenters v. Bernhardt*, Case 1:13-cv-00361-RJL, ECF Nos. 126, 127. The Agreement required the Service to propose a revision to the 2012 Rule and then either withdraw the proposal or finally revise the designation by December 23, 2020. The Court maintained jurisdiction to enforce the Settlement Agreement and ensure compliance. *Id.*

## C.    January 2021 Critical Habitat Designation

55.    Consistent with the Settlement Agreement, on August 11, 2020, the Service published a revised critical habitat rule that identified proposed exclusions under Section 4(b)(2) of the ESA. 85 Fed. Reg. 48,487 (Aug. 11, 2020). The proposal explained that the exclusions were "based on new information that has become available since [the Service's] 2012 revised critical habitat designation for the northern spotted owl." *Id.* at 48,487.

19

56.    The proposal sought public comments on, among other topics, whether the Service should exclude identified areas as critical habitat; any additional areas that should be considered for exclusion, including any National Forest System lands, and any economic, national security, or other relevant impacts of excluding those areas; and "any significant new information or analysis concerning economic impacts" that should be considered "in the balancing of the benefits of inclusion versus the benefits of exclusion in the final determination." *Id.* at 48,488.

57.    The proposal made clear that in the final rule the Service "may exclude additional areas if we find that the benefits of exclusion outweigh the benefits of inclusion or may remove areas if we find that the area does not meet the definition of 'critical habitat.'" *Id.* The Service explained that "[a]ny changes made in the final rule should be of a type that could have been reasonably anticipated by the public, and therefore a logical outgrowth of the proposal." *Id.* "Changes in a final revision would be reasonably anticipated if: (1) We base them on the best scientific and commercial data available and take into consideration the relevant impacts; (2) we articulate a rational connection between the facts found and the conclusions made, including why we changed our conclusion; and (3) we base removal of any areas on a determination either that the area does not meet the definition of 'critical habitat' or that the benefits of excluding the area will outweigh the benefits of including it in the designation." *Id.* Thus, the Service clearly acknowledged that additional exclusions may be made based on public comments, the best scientific and commercial data available, and the Service's obligations under the ESA and O&C Act.

58.    The Service received over 500 comment letters on the proposed rule, including comments from many of the Plaintiffs here.

59.     Plaintiff AFRC submitted comments on the proposal and a detailed economic analysis of the 2012 critical habitat designation prepared by expert economists at The Brattle Group ("Brattle Report"). Comments of AFRC on the Proposed Rule, Critical Habitat for the Northern Spotted Owl, Docket ID No. FWS-R1-ES-2020-0050-0553 (Oct. 13, 2020). AFRC urged the Service to exclude "at least 2,506,890 acres beyond the proposal, for a total exclusion of 2,711,543 acres and a remaining critical habitat designation of 6,866,426 acres—virtually equivalent to the original 1992 designation of about 6,887,000 acres." *Id.* at 1. AFRC also supported the Service's proposal to exclude all BLM Harvest Land Base acres (BLM land committed to permanent timber production), the White Pass Ski Area, and lands managed by the Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians and the Cow Creek Band of Umpqua Tribe of Indians. *Id.*

60.     Supported by the Brattle Report, AFRC urged the Service to exclude Matrix and BLM lands that are not suitable habitat for the Owl because the conservation benefit to the Owl of including these lands is negligible while the economic impacts of inclusion are catastrophic for the timber industry and local communities. The Brattle Report showed that designation of uninhabited Matrix and BLM lands has disastrous consequences—losses of up to $1.2 billion with little or no corresponding conservation benefit. The study estimates about 1.7 million uninhabited acres were designated as critical habitat that are otherwise designated for timber production. On these 1.7 million acres, critical habitat designations greatly diminish harvest and cause losses to the market of between $66.4 million and $77.2 million on an annualized basis and between $753 million and $1.18 billion over 20 years on a net present value basis. In Oregon alone, the benefits of excluding uninhabited Matrix and BLM lands equates to $55 million in additional timber harvest a year, which would generate $70 million in state GDP and $46 million in worker earnings. Across

California, Oregon, and Washington, exclusion would result in a loss of $100 million in GDP, $66 million in worker earnings, and 1,286 jobs annually due to increased timber harvest. By reducing domestic timber production, the critical habitat designation also deepens the country's reliance on wood imported from other countries.[1]AFRC and other commenters also explained that most uninhabited Matrix and BLM lands provide little or no benefit to the Owl, as the lands are either incapable of supporting Owls due to barred owl presence or because those lands lack suitable Owl habitat. Moreover, active management of lands enabled by exclusion is essential to helping reduce the risk of catastrophic wildfires that have recently decimated lands that are Owl habitat. Indeed, the Service itself has recognized the benefits of active management for long-term Owl conservation. *See* U.S. Fish & Wildlife Serv., Revised Recovery Plan for the Northern Spotted Owl (*Strix occidentalis caurina*) at ix, II-11 (2011), *available at* https://www.fws.gov/sites/d efault/files/documents/NSO_RevisedRP_2011.pdf.

61.    Plaintiffs Lewis County and Skamania County also submitted comments on the proposal, which incorporated AFRC's comments and "provid[ed] added detail on the matrix and adaptive management lands within their borders, which the Northwest Forest Plan designated for timber harvest." Comments of Lewis and Skamania Counties on the Proposed Rule, Critical Habitat for the Northern Spotted Owl, Docket ID No. FWS-R1-ES-2020-0050-0554 (Oct. 13, 2020). The counties explained that "[t]his acreage does not function as northern spotted owl habitat and its continued designation causes the Counties catastrophic economic harm." *Id.* The comments

---

[1] As of October 2024, the U.S. had a trade deficit in wood products of $1.23 billion. Exports accounted for $733 million, while imports accounted for $1.96 billion, with the country's biggest sources of imported wood products including Canada, China, Brazil, Chile, and Vietnam. Observatory of Econ. Complexity, Wood Products in United States, https://oec.world/en/profile/bilateral-product/wood-products/reporter/usa?timeLinePlot=yearOption&flowLineplot=exportOption&yearExportSelect or=exportYear22 (last accessed Feb. 10, 2025).

provided economic analysis by the Brattle Group. Additionally, the counties' expert wildlife biologist reviewed confidential data from the Washington State Department of Fish and Wildlife regarding Owl presence. The expert explained that, within Matrix and adaptive management area lands in Lewis County, there has been no confirmed Owl spotting in over a decade, and in Skamania County, there have been no detections since 2009. The counties explained that "the matrix and adaptive management areas, along with the checkerboard areas in Lewis County and acreage with younger forest stands, do[] not function as habitat and should be removed" from the critical habitat designation. *Id.* at 11.

62.    On December 22, 2020, the parties to the Settlement Agreement agreed to extend the deadline for the Service to withdraw or finalize the proposed revised critical habitat designation to January 6, 2021. Case 1:13-cv-00361-RJL, ECF 132, 134.

63.    On January 15, 2021, the Service issued its final rule, which excluded approximately 3,472,064 acres in California, Oregon, and Washington, under Section 4(b)(2) of the ESA, effective March 16, 2021. 86 Fed. Reg. at 4,820.

64.    The Service explained that the exclusions are based on "reconsideration of the relevant impacts under section 4(b)(2) of the Act as well as new information since our 2012 revised critical habitat designation for the northern spotted owl." *Id.*

65.    The January 2021 Rule excluded 1,373,693 acres of O&C Lands, which the Service determined was appropriate because "[t]he O&C Act provides . . . that the primary use of these revested timberlands is for permanent forest production on a sustained yield basis." *Id.* at 4,822. The January 2021 Rule also excluded approximately 2,077,697 acres of Forest Service and BLM-managed Matrix lands that are designated for timber production under the Northwest Forest Plan. 86 Fed. Reg. at 4,839.

66.    In deciding to exclude O&C Lands and Matrix lands from the critical habitat designation, the Secretary examined the benefits of including and the benefits of excluding these lands and determined the benefits of exclusion outweigh the benefits of inclusion, and that exclusion would not result in the Owl's extinction. *Id.* at 4,839-40. The Service explained that "[e]ven after excluding these lands, there remain approximately 6,105,279 acres of designated critical habitat as well as several million additional acres of protected habitat for the northern spotted owl in designated wilderness and National Parks, throughout the owl's range. Although the excluded areas provide some conservation value, the Secretary has determined that the benefits of excluding the O&C lands, given their mandated primary use for timber harvest, and the [Northwest Forest Plan] matrix lands, given their multiple-use values, outweigh the value of their inclusion as critical habitat." *Id.* at 4,840 (emphasis added). The Service further explained that a benefit of exclusion is that it allows "management practices to protect forested lands from catastrophic wildfire," which destroy Owl habitat. *Id.* at 4,823.

**D.    Delay of the January 2021 Rule**

67.    On March 1, 2021, after a change in Presidential administration, the Service and Interior issued a rule that changed the effective date of the January 2021 Rule from March 16, 2021, to April 30, 2021. Endangered and Threatened Wildlife and Plants; Revised Designation of Critical Habitat for the Northern Spotted Owl; Delay of Effective Date, 86 Fed. Reg. 11,892 ("Delay Rule").

68.    The Delay Rule stated that it was effective immediately. *Id.* at 11,893. The Service did not provide the public with notice or an opportunity to comment on the Delay Rule, even though it amends the effective date of the January 2021 Rule, which was the product of extensive public comments and the Service's findings regarding its obligations under the ESA.

69.    The Delay Rule claims that "the totality of the circumstances here—the history of litigation and newly threatened suits, the potential for a 'logical outgrowth' problem in the final [January 2021] rule, and the threat to the Service's execution of its statutory functions, among other issues—indicate that there is good cause to forgo notice and comment procedures here because it is impractical and contrary to the public interest for the Service to provide notice and an opportunity to comment on an extension of the effective date," and "that there is good cause to make the rule effectively immediately instead of waiting until 30 days after publication for it to become effective." *Id.* at 11,894.

70.    On April 30, 2021, the day the delayed January 2021 Rule was supposed to take effect, the Service and Interior issued the Further Delay Rule, which purported to be effective retroactively as of April 29, 2021, and further delayed the January 2021 Rule's effective date to December 15, 2021. 86 Fed. Reg. 22,876 (April 30, 2021). The Service and Interior planned to issue the Further Delay Rule before they had issued the Delay Rule. In fact, agency officials had drafted a rule further delaying implementation of the January 2021 Rule before the Service and Interior had published the Delay Rule.

71.    Once again, the Service did not provide the public with notice or an opportunity to comment on the Further Delay Rule and issued the rule effective immediately instead of making it effective 30 days or more after publication. And again, the Service also failed to comply with the ESA's additional rulemaking requirements under 16 U.S.C. § 1533(b).

72.    The Further Delay Rule claimed that public notice and comment was not required because the first Delay Rule served as a proposed rulemaking for the Further Delay Rule, notwithstanding the facts that the Further Delay Rule proposed a much longer delay and included discussion and rationales that were not addressed in the Delay Rule. Contradicting the view that

the Delay Rule served as a proposed rule for the Further Delay Rule, the Further Delay Rule also asserted that the good cause exceptions to the APA's notice-and-comment and 30-day-wait requirements are met. *Id.* at 22,880. The Further Delay Rule also repeated the same, flawed justifications that the Service provided for the Delay Rule, including "potential errors in the January 15, 2021, Final Rule," potential "concerns" with impacts on Owl recovery, and "potential for . . . uncertainty and confusion and a potential and unnecessary increase in administrative costs." 86 Fed. Reg. at 22,879-81.

**E.    The November 2021 Rule**

73.    On July 20, 2021, the Service proposed a rule to "withdraw" the January 2021 Rule and reinstate the 2012 Rule's critical habitat designations. Revised Designation of Critical Habitat for the Northern Spotted Owl, 86 Fed. Reg. 38,246 (July 20, 2021) ("Proposed November 2021 Rule").

74.    AFRC and the other Plaintiffs submitted comment letters requesting that the January 2021 Rule designations and exclusions remain in place and opposing the Service's purported withdrawal of the January 2021 Rule as violating the APA, ESA, and the settlement agreement in the 2012 Rule litigation. AFRC's comment letter included a supplemental report from the Brattle Group ("Supplemental Brattle Report") responding to a memo addressing the 2020 Brattle Report prepared by the Service's consultant, Industrial Economics Incorporated (IEc) and providing updated economic analysis.[2] The Supplemental Brattle Report explained the staggering economic effects of the proposed designation, finding that the designation would on an annualized basis reduce GDP by up to $107 million, cost up to 1,380 jobs, and result in up to $71

---

[2] Memorandum from Industrial Economic, Incorporated to the U.S. Fish and Wildlife Service regarding Responses to Comments Provided by the American Forest Resource Council (AFRC) on the Proposed Revised Critical Habitat for the Northern Spotted Owl (Nov. 10, 2020).

million in lost earnings across California, Oregon, and Washington. The Report also calculated GDP losses on a net present value basis between $947 million and $1.674 billion over 20 years. *Id.* at 19.

75.    The Service published its final rule on November 10, 2021. The November 2021 Rule "withdrew" the January 2021 Rule and instead excluded only 204,294 acres from designation, resulting in a 9.3-million-acre designation compared to a 6.1-million-acre designation under the January 2021 Rule. 86 Fed. Reg. 62,606 (Nov. 10, 2021).

76.    In issuing the November 2021 Rule, the Service did not complete the economic analysis required by Section 4(b)(2) or apply applicable, revised ESA regulations pertaining to the definition of habitat. The Service reasoned that these requirements did not apply because it was only excluding approximately 200,000 acres from the Owl's critical habitat designation rather than adding over 3 million acres. The Service also relied on the decade-old Final Economic Analysis prepared by IEc, against the IEc's own advice that the study and underlying data were outdated. Nor did the Service complete any NEPA review in issuing the November 2021 Rule.

77.    On May 11, 2022, the Plaintiffs in the 2012 Rule challenge filed a motion to enforce the Settlement Agreement entered in *Pacific Northwest Regional Council of Carpenters v. Bernhardt*, Case 1:13-cv-00361-RJL, ECF 140 (Apr. 13, 2020). That motion is still pending.

78.    Before filing this suit, Plaintiffs notified the Service and the U.S. Department of the Interior of their intent to file ESA citizen suit claims challenging the November 2021 Rule. Attachments A & B. The notice of intent letter explained that the November 2021 Rule violates the ESA, the APA, and the Settlement Agreement, including for the reasons identified in the claims for relief below. Plaintiffs waited at least 60 days after providing the notice before bringing this Complaint, thus satisfying 16 U.S.C. § 1540(g).

**FIRST CLAIM FOR RELIEF**

***Violation of the APA and ESA for withdrawing the January 2021 Rule (5 U.S.C. § 706; 16***
***U.S.C. § 1540(g))***

79.    Plaintiffs incorporate by reference all preceding paragraphs.

80.    The APA requires agencies to engage in reasoned decision-making. As part of this requirement, the Service was obligated to disclose the basis for its actions and evaluate all relevant factors. The grounds upon which an agency acts must be clearly disclosed and adequately sustained.

81.    The Service based the November 2021 Rule on the false notion that the Service was only excluding areas from designation, not adding them. This reasoning is arbitrary, capricious, and unlawful for several reasons.

82.    First, the Service assumed that the Delay Rules validly prevented the January 2021 Rule from revising the Owl's critical habitat designation. However, the Delay Rules did not amend the January 2021 Rule's effective date because they violated the APA and ESA by failing to comply with the APA or ESA's notice and comment rulemaking requirements without good cause. *See Am. Forest Res. Council v. Williams*, No. 1:21-cv-00601-RJL (D.D.C.), ECF Nos. 1, 13, 26, 42. The Delay Rules also did not validly amend the January 2021 Rule's effective date because they failed to reasonably justify delaying the January 2021 Rule's effective date and failed to address the consequences of delay and other relevant factors. Accordingly, the November 2021 Rule's reliance on the Delay Rules is arbitrary, capricious, and unlawful.

83.    Second, even if the Delay Rules validly prevented the January 2021 Rule from taking effect, the Service still could not "withdraw" the January 2021 Rule and evaluate the November 2021 Rule as if the January 2021 Rule never revised the critical habitat designation. Under the APA, the January 2021 Rule was a final rule subject to amendment or repeal, not

withdrawal. In violation of the APA, the Service unlawfully purported to withdraw the January 2021 Rule and improperly evaluated the November 2021 critical habitat designation as if the January 2021 Rule had never revised the Owl's critical habitat designation.

84.    Third, the November 2021 Rule's justifications for withdrawing the January 2021 Rule—including that the final January 2021 Rule was not a logical outgrowth of the proposed rule and would cause the Owl's extinction if not withdrawn—are arbitrary and capricious and contrary to law. With respect to the logical outgrowth justification, the final January 2021 Rule was clearly a logical outgrowth of the proposed rule it followed, as shown by the proposed rule's plain text and the comments submitted in response to the proposal. With respect to the extinction analysis, the November 2021 Rule is based on an unlawful interpretation of ESA section 4(b)(2) as barring critical habitat exclusions that would not provide for "conservation" of the species. Reversing its interpretation of the section 4(b)(2)'s extinction analysis in the January 2021 Rule, the Service found that extinction need not be "directly caused by the exclusion" for the exclusion to be prohibited. *See* 86 Fed. Reg. at 38,250. The Service's new interpretation unlawfully reads the element of causation out of the ESA's requirement that areas not be excluded if exclusion "will result in the extinction of the species." 16 U.S.C. § 1533(b)(2). Moreover, the Service's extinction analysis in the November 2021 Rule irrationally did not evaluate the effect of the specific exclusions made by the January 2021 Rule, and instead evaluated an entirely different, hypothetical exclusion, pursuant to which all NSO habitat except for that in National Parks would be excluded from designation. *See* 86 Fed. Reg. at 62,638

85.    Finally, the November 2021 Rule's purported withdrawal of the January 2021 Rule before it took effect is arbitrary, capricious, and unlawful because it violates the Settlement Agreement entered in the 2012 Rule challenge. The Settlement Agreement required the Service to

propose a new critical habitat designation and then either withdraw the proposal or issue a final revised designation by December 23, 2020 (extended by mutual agreement of the parties to January 6, 2021). In violation of the Agreement, the Service issued the January 2021 Rule but then withdrew it months later as if it had never revised the critical habitat designation.

86.     Accordingly, the November 2021 Rule is arbitrary and capricious, an abuse of discretion, not in accordance with law, and in excess of Defendants' statutory authority.

### SECOND CLAIM FOR RELIEF
***Violation of the ESA and APA for failure to consider best available scientific and commercial data (16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706)***

87.     Plaintiffs incorporate by reference all preceding paragraphs.

88.     The ESA requires that critical habitat determinations be based on "the best scientific and commercial data available." 16 U.S.C. § 1533(b)(1)(A). The November 2021 Rule violates this requirement and is arbitrary and capricious because the Service failed to use use best available scientific and commercial data regarding:

    a.  the impact of designation on timber harvest levels and other private-sector and regional socioeconomic impacts;

    b.  increased barred-owl encounter rates and the effects of barred owl presence on an area's ability to function as viable habitat for the Owl and benefit the Owl's conservation;

    c.  the benefits of active forest management to Owl habitat and the adverse impacts that critical habitat designation has on federal agencies' abilities to actively manage forests to reduce wildfire risk and promote forest health;

    d.  areas impacted by high-severity fires and the ability of such areas to serve as Owl habitat; and

e.   updated mapping data regarding forest types, age, and sizes needed to identify areas that provide Owl habitat.

89.   In issuing the November 2021 Rule, the Service instead continued to rely on the 2012 Rule's flawed, outdated, and incorrect model and data inputs. The Service did so even though the creators of the model, which include several Service officials, had acknowledged that data used in modeling supporting the 2012 Rule are outdated, including data on vegetation mapping, areas occupied by barred owls, and the effects of barred owl presence on the Owl.[3]

### THIRD CLAIM FOR RELIEF
***Violation of the ESA and APA for unlawfully designating non-habitat and failing to justify designation of areas that were not occupied by the Owl at the time of its listing (16 U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706)***

90.   The November 2021 Rule also unlawfully designated lands that are not habitat as critical habitat and failed to use the applicable regulatory definition of habitat.

91.   In *Weyerhaeuser Co. v. U.S. Fish & Wildlife Service*, 586 U.S. 9 (2018), the Supreme Court unanimously rejected the Service's longstanding practice of designating land that might develop into habitat in the future if the Service believed designation of such areas to be "essential for the conservation of the species."

92.   After *Weyerhaeuser*, the Service issued a regulation defining "habitat" for the purpose of designating critical habitat as "the abiotic and biotic setting that currently or periodically contains the resources and conditions necessary to support one or more life processes of a species." 50 C.F.R. § 424.02. The Service unlawfully failed to apply this new, applicable

---

[3] *See* Dunk J.R., et. al, Conservation planning for species recovery under the Endangered Species Act: A case study with the Northern Spotted Owl, PLoS ONE 14(1): e0210643 (2019) at p. 38 & S1 Appx. at pp. 7, 11, *available at* https://doi.org/10.1371/journal.pone.0210643.

definition in issuing the November 2021 Rule or reasonably explain how the new definition applies to the Owl's critical habitat designation.

93.    In issuing the November 2021 Rule and the 2012 Rule on which it is based, the Service instead followed the same practice as it did in designating the land at issue in *Weyerhaeuser*, resulting in the designation of over a million acres of non-habitat as critical habitat for the Owl. The November 2021 Rule violates the ESA by continuing the 2012 Rule's unlawful designation of (1) younger forests that are not Owl habitat but could become habitat; (2) dispersal areas that are not habitat but merely land that owls might travel through; (3) areas destroyed by high-severity wildfire that do not have the features of habitat and are no longer capable of being inhabited by the Owl; (4) non-contiguous, widely dispersed areas that are not big enough to support the Owl; and (5) areas densely inhabited by barred owls.

94.    The Service also violated the ESA's heightened standard for designating areas that were not occupied by the Owl at the time of listing as critical habitat. *See* 16 U.S.C. §1532(5)(A)(ii). Consistent with the statute, the ESA regulations applicable when the Service issued the 2021 Rule required the Service to only designate "specific areas outside the geographical area occupied by the species only upon a determination that such areas are essential for the conservation of the species." 50 C.F.R. § 424.12(b)(1)(2) (Sep. 26, 2019). Specifically, the Service must "first evaluate areas occupied by the species [at the time of listing]" and then "only consider unoccupied areas to be essential where a critical habitat designation limited to geographical areas occupied would be inadequate to ensure the conservation of the species." *Id*.

95.    The Service violated these requirements in issuing the November 2021 Rule. First, the Service did not first identify and evaluate only areas occupied by the Owl at the time of listing. Instead, as the Service did in issuing the 2012 Rule, it unreasonably assumed that any areas that

mapping data indicated had habitat features able to support occupancy by the Owl in the years before and after the time of its listing were in fact occupied at that time. Indeed, the Service conceded that this assumption is flawed and that that "parts of most units and subunits contain a forested mosaic that includes younger forests that may not have been occupied at the time of listing." 86 Fed. Reg. at 62,639. But the Service did not find that limiting the designation to occupied areas would be inadequate to ensure the conservation of the species. It skipped this step. And any such finding that designating unoccupied areas is essential would be unsupportable given the many millions of acres of designated critical habitat that were occupied by the Owl at the time of listing, in addition to millions of additional acres that are already managed for the benefit of the Owl in nation parks and wilderness areas, and under the Northwest Forest Plan and other federal land management plans. The Service failed to consider these issues and reasonably find the designated unoccupied areas was essential for the conservation of the species.

96.    By designating non-habitat as critical habitat for the Owl, failing to apply the applicable regulatory definition of habitat, and failing to support designation of unoccupied habitat, the Service violated the ESA and acted arbitrarily and capriciously in violation of the APA.

**FOURTH CLAIM FOR RELIEF**
***Violation of the ESA for failing to consider economic and social impacts of designation (16
U.S.C. §§ 1533, 1540(g); 5 U.S.C. § 706)***

97.    ESA Section 4(b)(2) "imposes a categorical requirement that the Secretary [of the Interior] tak[e] into consideration economic and other impacts before" designating critical habitat. *Weyerhaeuser*, 586 U.S. at 24 (quotation marks omitted); *see also* 50 C.F.R. § 424.19(b) (requiring the Service to "make available for public comment the draft economic analysis of any critical habitat designation or revision. The draft economic analysis will be summarized in the Federal Register notice of the proposed designation of critical habitat.").

98.     The Service violated this requirement in issuing the November 2021 Rule. The Service did not prepare a draft economic analysis in the proposed November 2021 Rule. Rather, the Service unreasonably found that an economic analysis was not required because the November 2021 Rule was only removing areas from critical habitat.

99.     While the Service prepared the Final Economic Analysis before issuing the 2012 Rule, that analysis did not satisfy the ESA's economic analysis requirement because it was based on outdated data. Indeed, the economic consultant that prepared the Final Economic Analysis advised the Service that its decade-old economic analysis was outdated. Moreover, the Final Economic Analysis made subject to public comment evaluated a critical habitat configuration proposed in 2011 that was very different than the area designated by the November 2021 Rule. The amount of land unoccupied by NSO (e.g., younger forests that were not currently habitat) included in the final 2012 Rule and November 2021 Rule increased from approximately 1.3 million acres in the proposed 2011 designation to approximately 1.7 million acres. The 2012 Final Economic Analysis thus significantly undervalued losses from reduced harvest that will result from the November 2021 Rule, including areas that have concentrated economic effects on local counties that are Plaintiffs here. Compounding this oversight, the Service failed to consider that the Owl no longer occupies hundreds of thousands of additional acres because of high-intensity fires and the spread of barred owls, and thus the ESA's consultation requirements and the economic costs that follow would not apply in these areas absent their designation.

100.     The November 2021 Rule and the 2012 Final Economic Analysis on which it relies are also arbitrary and capricious for numerous other reasons. They (1) inexplicably find that harvests may *increase* as a result of designation; (2) fail to adequately quantify incremental effects on timber harvest by relying on arbitrary and unsubstantiated stumpage values and yield

assumptions, or to explain those assumptions; (3) do not fully consider secondary, private-sector and regional socioeconomic effects of reduced timber harvests; and (4) unreasonably contend that designating unoccupied lands causes few or no economic impacts while inconsistently acknowledging that the Owl listing decision caused severe economic impacts by making areas occupied by Owl subject to ESA section 7 consultation. For similar reasons, the Service also failed to reasonably evaluate the benefits of including land as critical habitat weighed against the benefits of excluding land. For example, the Service did not consider whether the benefits of excluding areas that cannot support the Owl because of fire damage or the presence of barred owls outweigh any minimal benefit to the Owl from designating these areas.

101.    The Service also failed to conduct an exclusions analysis with respect to several areas the public commenters requested to be excluded in issuing the November 2021 Rule. For example, the Service did not consider requested exclusions of: areas lacking suitable habitat, including younger forests; areas impacted by high-severity wildfire; fragmented areas that lack the capacity to support the Owl; fire-prone, dry-forest subunits that should be excluded to facilitate active management to prevent wildfires that threaten the Owl; adaptive management areas and experimental forests; lands in Douglas County and other communities whose economies substantially depend on timber harvests; and White Pass Ski Area. To the extent that the Service provided any rationales for not examining these requested exclusions, the rationales were arbitrary and capricious. For example, the November 2021 Rule states that designating an areas as critical habitat facilitates active forest management, contrary to best available science, the Service's own prior statements, and the consistent findings of other federal agencies.

102.    For these reasons, the Service violated Section 4(b)(2)'s requirement to prepare an assessment of economic and other impacts of designating areas as critical habitat and acted arbitrarily and capriciously in violation of the APA.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court grant the following relief:

1.    DECLARE that the November 2021 Rule violates the APA, 5 U.S.C. § 706, and the ESA, 16 U.S.C. §§ 1533, 1540(g), because the Service unlawfully withdrew the January 2021 Rule and failed to provide a reasoned basis for doing so;

2.    DECLARE that the Service's November 2021 Rule is arbitrary and capricious, not in accordance with law, and in excess of the Service's authority under the APA and ESA;

3.    VACATE the November 2021 Rule;

4.    DECLARE that the November 2021 Rule failed to validly withdraw the January 2021 Rule and reinstate the January 2021 Rule;

5.    ISSUE a mandatory injunction compelling Defendants to vacate the November 2021 Rule and to reinstate the 2021 Critical Habitat Rule;

6.    AWARD Plaintiffs their costs of litigation, including reasonable attorney and expert witness fees, pursuant to the ESA, 16 U.S.C. §1540(g), the Equal Access to Justice Act, 28 U.S.C. § 2412, and/or any other applicable law; and

7.    GRANT such additional relief as the Court may deem just and proper.

Dated: April 7, 2025

Respectfully submitted,

By:  _/s/ Tyler Welti_
Tyler Welti (D.C. Bar No. 1015691)
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
415.653.3714
415.653.3755 (fax)
tgwelti@venable.com

Aaron J. Aber (D.C. Bar No. 1735362)
VENABLE LLP
600 Massachusetts Avenue NW
Washington, DC 20001
202.344.4272
ajaber@venable.com

Counsel for Plaintiffs