**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. FISH & WILDLIFE SERVICE, et al., <br><br> Defendants, <br><br> and <br><br> CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Defendant-Intervenors. | Case No: 1:25-cv-01048-RJL |

**MEMORANDUM IN SUPPORT OF JOINT MOTION FOR APPROVAL OF
STIPULATED SETTLEMENT AGREEMENT**

## I.     INTRODUCTION

Plaintiffs and Federal Defendants jointly move the Court for the entry of an Order approving the terms of a Stipulated Settlement Agreement ("Agreement") that will resolve Plaintiffs' claims that the U.S. Fish and Wildlife Service's ("the Service") November 10, 2021 final rule designating critical habitat for the northern spotted owl is contrary to the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*.  As demonstrated herein, the terms of the Agreement are fair, adequate, reasonable, and in the public interest. Moreover, the Agreement will not harm the interests of, or result in legal prejudice to, Defendant-Intervenors.  Consequently, under the limited standard of review applicable to approval of consent decrees, the Court should grant Plaintiffs' and Federal Defendants'

motion over any objection from Defendant-Intervenors, approve the Agreement, and dismiss the Complaint with prejudice.

## II.    STATUTORY AND REGULATORY BACKGROUND

Congress enacted the ESA, 16 U.S.C. §§ 1531-1544, in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species. . . ." *Id.* § 1531(b). Section 4 of the ESA directs the Secretary to determine which species should be listed as endangered or threatened[1] based on consideration of five factors. *Id.* § 1533(a)(1). Listed species enjoy a variety of legal protections. *See id.* §§ 1533(d), 1536, 1538; 50 C.F.R. § 17.31(a).

Concurrently with making listing determinations, the Service must designate critical habitat to the maximum extent prudent and determinable. 16 U.S.C. § 1533(a)(3)(A)(i). Critical habitat is defined as:

> (i) the specific areas within the geographical area occupied by the species, at the time it is listed . . . on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and (ii) specific areas outside the geographical area occupied by the species at the time it is listed . . . upon a determination by the Secretary that such areas are essential for the conservation of the species.

*Id.* § 1532(5)(A).

The ESA requires the Secretary to "designate critical habitat, and make revisions thereto, . . . on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying any particular

---

[1]  A species is endangered if it is "in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A species is threatened if it is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

area as critical habitat." *Id.* § 1533(b)(2).  The Service designates critical habitat by regulation published in the Federal Register after notice and comment.  *See id.* § 1533(a)(3)(A).  "The Secretary may exclude any area from critical habitat if he determines that the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless he determines, based on the best scientific and commercial data available, that the failure to designate such area as critical habitat will result in the extinction of the species concerned." *Id*. § 1533(b)(2).  The ESA provides that the Service "may, from time-to-time thereafter as appropriate, revise such [critical habitat] designation." *Id*. § 1533(b)(3)(A)(ii).

### III.    FACTUAL BACKGROUND

In 1990, the Service listed the northern spotted owl, *Strix occidentalis caurina* ("owl"), as a threatened species.  55 Fed. Reg. 26114 (June 26, 1990).  The Service first designated critical habitat for the owl in 1992, 57 Fed. Reg. 1796 (Jan. 15, 1992), and revised the critical habitat designation in 2008.  73 Fed. Reg. 47326 (Aug. 13, 2008).  The 2008 critical habitat designation was challenged in litigation and voluntarily remanded to the Service.  *See Carpenters Indus. Council v. Salazar*, 734 F. Supp. 2d 126 (D.D.C. 2010).

On December 4, 2012, the Service published a final rule revising the designated critical habitat for the owl.  77 Fed. Reg. 71876 (Dec. 4, 2012).  In 2013, a group of plaintiffs (including some of the Plaintiffs here) challenged the 2012 critical habitat designation, asserting a range of claims including attacks on the Service's habitat modeling.[2] *Carpenters Indus. Council v. Bernhardt*, Case No. 1:13-cv-00361-RJL, Dkt. 1 (D.D.C., Mar. 21, 2013).  The district court dismissed

---

[2]  A coalition of environmental groups (Center for Biological Diversity, Cascadia Wildlands, Cascade Forest Conservancy, Audubon Society of Portland, Sierra Club, Wilderness Society, Environmental Protection Information Center, Klamath-Siskiyou Wildlands Center, and Oregon Wild) moved to intervene; that motion was denied.

the case on standing grounds, but the D.C. Circuit reversed. *Carpenters Indus. Council v. Zinke*, 854 F.3d 1 (D.C. Cir. 2017). In April 2020, the parties entered into a court-approved settlement agreement resolving the litigation. *Carpenters Indus. Council*, Case No. 1:13-cv-00361-RJL, Dkt. 126 (D.D.C., Apr. 13, 2020). Under the April 2020 agreement, the Service committed to "submit a proposed revised critical habitat rule that identifies proposed exclusions under ESA Section 4(b)(2) to the Federal Register on or before July 15, 2020," and then "submit to the Federal Register a final revised critical habitat rule on or before December 23, 2020, or withdraw the proposed rule by that date if the Service determines not to exclude any areas from the designation under ESA Section 4(b)(2)." *Id*. at ¶¶ 1-2. In exchange, Plaintiffs agreed to dismiss their claims with prejudice. *Id*. On December 22, 2020, the parties agreed to extend the deadline for the Service to withdraw or finalize the proposed revised critical habitat designation to January 6, 2021. *Carpenters Indus. Council*, Case No. 1:13-cv-00361-RJL, Dkt. 132 at 2.

The Service submitted a proposed rule to the Federal Register on July 15, 2020, which proposed exclusions from the critical habitat designation pursuant to ESA Section 4(b)(2). *See* 85 Fed. Reg. 48487 (Aug. 11, 2020). On January 7, 2021, the Service submitted to the Federal Register a final rule with exclusions from the critical habitat designation. 86 Fed. Reg. 4820 (Jan. 15, 2021). The January 2021 rule stated an effective date of March 16, 2021, or sixty days after the date of publication. In 2021, the Service issued two rules delaying the effective date of the January 2021 rule. 86 Fed. Reg. 11892, 11895 (Mar. 1, 2021); 86 Fed. Reg. 22876 (Apr. 30, 2021).[3]

In the intervening months, the Service conducted a new rulemaking to again consider revisions to the owl's critical habitat designation. On July 20, 2021, the Service published a proposed

---

[3]  Plaintiffs in this case also challenged the delay rules but that case was dismissed as moot. *See Am. Forest Res. Council. v. Williams*, Case No. 21-cv-00601-RJL, 2022 WL 2290536, (D.D.C. June 24, 2022), *aff'd*, 96 F.4th 417 (D.C. Cir. 2024).

rule to withdraw the January 2021 Rule and instead exclude 204,797 acres from the species' critical habitat designation. 86 Fed. Reg. 38246. The Service then issued a final rule in November 2021 excluding 204,294 acres from the critical habitat designation, which went into effect on December 10, 2021. 86 Fed. Reg. 62606 (Nov. 10, 2021).  This November 2021 rule is the challenged action in this case.

Thereafter, the plaintiffs who were parties to the April 2020 settlement filed a motion to enforce that agreement.  *Carpenters Indus. Council*, Case No. 1:13-cv-00361-RJL (D.D.C.), Dkt. 140.  That motion is fully briefed and has been pending since June 2022.

In April 2025, Plaintiffs filed a four-count complaint against the Service and Secretary of the Interior for declaratory and injunctive relief.  *See* Dkt. 1.  Plaintiffs allege that the Service's November 2021 rule revising the critical habitat designation for the northern spotted owl violates the ESA and the APA because: (1) the Service's withdrawal of the January 2021 rule was arbitrary, capricious, and unlawful for several reasons (2) the Service failed to consider the best available scientific and commercial data; (3) the Service unlawfully designated non-habitat and failed to justify designation of areas that were not occupied by the species at the time of its listing; and (4) the Service failed to consider the economic and social impacts of designation or adequately evaluate whether certain areas identified in public comments should have been excluded from the designation.  *Id*. ¶¶ 87-102.

In December 2025, the Court allowed a group of environmental organizations to join this lawsuit as Defendant-Intervenors.  Before that motion was granted, however, Plaintiffs and Federal Defendants engaged in discussions regarding settlement.  After negotiations, Plaintiffs and Federal Defendants have reached a settlement memorialized in the Agreement.  *See* Exhibit A.

As stated in the Agreement, the Service has already begun a rulemaking to consider whether areas designated under the November 2021 final rule should be excluded from the critical habitat designation pursuant to ESA Section 4(b)(2).  *Id.* at p.4; *see also* Exhibit B (Declaration of G. Shultz ¶ 5).  Under the Agreement, the Service shall submit a proposed revised critical habitat rule that identifies areas being considered for exclusion, if any, on or before September 30, 2026.  Exhibit A ¶ 1.  Then, within one year after publication of the proposed rule in the Federal Register, the Service shall submit to the Federal Register for publication a final revised critical habitat rule or a notice that the proposed revised critical habitat rule is being withdrawn if the Service determines not to exclude any areas from the designation under ESA Section 4(b)(2).  *Id*. ¶ 2.  The Agreement would leave the November 2021 final rule in place during the rulemaking process.  Plaintiffs have agreed to dismiss the Complaint with prejudice pursuant to Federal Rule of Civil Procedure 41(a), except that Plaintiffs and Federal Defendants have agreed, and respectfully request, that the Court shall retain jurisdiction over the case to resolve any claims for attorney's fees and any motions to modify or enforce the Agreement.  *Id*. ¶¶ 6, 8.  Under the Agreement, Plaintiffs reserve the right to challenge any final determination on the proposed revised critical habitat rule required under the Agreement in a separate action, and Defendants and the Service reserve all defenses to any such action.  *Id*. ¶ 13.  Plaintiffs also have agreed to file a motion in other related litigation, *Carpenters Industrial Council*, Case No. 1:13-cv-00361-RJL (D.D.C.), to seek to have the Court hold their pending motion to enforce in abeyance during any rulemaking process.  *Id*. ¶ 5.  And, if the Service ultimately issues a final rule revising the owl's critical habitat designation as described in the Agreement, Plaintiffs will seek to withdraw the motion to enforce.  *Id*.

IV.    **STANDARD OF REVIEW**

"Approving a consent decree 'is a judicial act,' and the Court undertakes it with care." *United States v. Wells Fargo Bank, NA*, 891 F. Supp. 2d 143, 145 (D.D.C. 2012) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995) (per curiam)). The Court must "determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) (citations omitted). It must also determine whether a consent decree is consistent with the public interest. *Id.* (citations omitted). "[S]hort of a decree that 'makes a mockery of judicial power,' the Court should accept an agreement between the parties." *Wells Fargo Bank, NA*, 891 F. Supp. 2d at 145 (quoting *Microsoft Corp.*, 56 F.3d at 1462).

In assessing whether a consent decree is consistent with the public interest, the Court should be guided by the principle that "[f]ew public policies are as well established as the principle that courts should favor voluntary settlements of litigation by the parties to a dispute." *Am. Sec. Vanlines v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986) (per curiam) (citations omitted). "Not only do settlement agreements 'produce a substantial savings in judicial resources,' but they also 'promote efficient use of private resources by reducing litigation and related costs.'" *Wright v Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 176 (D.D.C. 2007) (quoting *Am. Sec. Vanlines*, 782 F.2d at 1060); *see also Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 9 (D.D.C. 2013) ("Generally it is not only the parties, but also the general public, that benefit from the time and monetary savings that result from voluntary settlements."). "In order to encourage these public policies, 'settlement agreements are to be upheld whenever possible.'" *Wright*, 503 F. Supp. at 176 (quoting *Am. Sec. Vanlines*, 782 F.2d at 1060) (internal citations and quotation marks omitted).

7

"[A] federal consent decree must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Local Number 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("*Firefighters*")).  However, the Court should not reach any ultimate conclusions on the contested issues of fact and law which underlie the merits of the dispute.  *Citizens for a Better Env't*, 718 F.2d at 1125 ("[A] district court has power to enter a consent decree without first determining that a statutory violation has occurred.").

## V.    ARGUMENT

### A.    The Agreement Is Procedurally and Substantively Fair.

This Court should find that the Agreement is procedurally and substantively fair. "A review of the fairness of a proposed consent decree requires an assessment of the good faith of the parties, the opinions of the counsel, and the possible risks involved in litigation if the settlement is not approved." *Env't Def v. Leavitt*, 329 F. Supp. 2d 55, 70 (D.D.C. 2004) (citation omitted).  The Court's role is not to substitute its judgment for that of the parties, but to conduct an independent assessment to ensure that the terms of the decree are fair and not against public policy. *See Citizens for a Better Env't*, 718 F.2d at 1126; *United States v. Trucking Emps., Inc.*, 561 F.2d 313, 317 (D.C. Cir. 1977); *United States v. District of Columbia*, 933 F. Supp. 42, 47 (D.D.C. 1996).

"An assessment of procedural fairness involves looking 'to the negotiating process and attempt[ing] to gauge its candor, openness, and bargaining balance.'" *District of Columbia*, 933 F. Supp. at 48.  The negotiations in this case have been rigorous and conducted in good faith. Plaintiffs and Federal Defendants are represented by experienced counsel who actively negotiated the terms of the Agreement over several months.  *United States v. Daimler AG*, Civ. Action No.

8

20-2564 (EGS), 2021 WL 878894, at *5 (D.D.C. Mar. 9, 2021) (Finding a consent decree fair where "[e]ach party was represented by experienced counsel and engaged in [extensive] settlement negotiations[.]").  Federal Defendants have informed the Court several times that they were engaged in efforts to resolve Plaintiffs' claims without further litigation.  Dkt. 34, 42, 43, 44.  Federal Defendants provided the draft Agreement to Intervenor-Defendants after the Court granted Defendant-Intervenors' motion to intervene, giving all parties a fair opportunity to review its terms.  In short, the Agreement "was reached as a result of good faith, arms-length negotiation," showing that it is procedurally fair.  *See District of Columbia*, 933 F. Supp. at 48.

The Agreement also is fair because it embodies a reasonable compromise between Plaintiffs and Federal Defendants.  *See Wells Fargo Bank, NA*, 891 F. Supp. 2d at 145 (arms-length negotiations resulting in "benefits to both sides . . . itself indicates that the agreement is procedurally fair.").  The Agreement provides some relief to Plaintiffs in that it memorializes the Service's plan to undertake a rulemaking to consider whether areas designated under the November 2021 final rule should be excluded from the owl's critical habitat designation and provides an enforceable timeline for that determination.  *See generally* Exhibit A.  The Agreement also benefits Federal Defendants by providing for a process for reconsideration of the November 2021 final rule and avoiding the need to litigate Plaintiffs' claims seeking vacatur of that rule and reinstatement of the rule that the Service submitted to the Federal Register in January 2021.  *See* Dkt. 1, Request for Relief  ¶¶ 4-5 (referring to 86 Fed. Reg. 4820 (Jan. 15, 2021)).  Plaintiffs also have agreed to request that the Court hold their motion to enforce the April 2020 settlement agreement reached in another case in abeyance and, if the Service ultimately issues a final rule, to withdraw that motion entirely.  Exhibit A ¶ 5.  In short, the Agreement provides each party with some, but not all, of the outcomes that each seeks.

In exchange for Plaintiffs' compromise with respect to the relief sought, the Service has stated that it has already begun work on a rulemaking to consider whether areas designated under the November 2021 final rule should be excluded from the owl's critical habitat designation. Exhibit A at p.4; *see also* Exhibit B (Decl. of G. Shultz ¶ 5). If the Service determines that such revisions are appropriate, it will issue proposed and final rules pursuant to a reasonable and defined schedule. Exhibit A ¶¶ 1-2. The Agreement does not, however, obligate the Service to reach any particular substantive result or limit the discretion afforded to the Service by the ESA, the APA, or general principles of administrative law regarding the procedures to be followed in making any determination. *Id*. at p.4 & ¶¶ 1, 9. The public will have an opportunity to participate in the comment process on any revisions to the owl's critical habitat designation.

Finally, a consent decree is substantively fair if it incorporates "concepts of corrective justice and accountability[.]" *Leavitt*, 329 F. Supp. 2d at 70 (internal quotation and citation omitted). The Agreement incorporates such principles by committing the Service to completing its evaluation of whether areas designated as critical habitat under the November 2021 final rule should be excluded from the designation within a specified timeframe. Exhibit A ¶¶ 1-2. If the parties had opted to continue litigation, the outcome would be uncertain. For example, if Plaintiffs were successful, the Court could have vacated the November 2021 final rule in its entirety, or the Court may have found for Federal Defendants and dismissed the Complaint. The Agreement reflects a balancing of litigation risk to arrive at a resolution; this is precisely the type of settlement that courts deem fair. *See United States v. Armour & Co*, 402 U.S. 673, 681 (1971) ("[I]n exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation."). Further, like the agreement found to be fair in

*Leavitt*, 329 F. Supp. 2d at 70, the Agreement includes modification and dispute resolution provisions, supporting its substantive fairness.  Exhibit A ¶ 12.

B.    **The Agreement Is Adequate, Reasonable, and Appropriate Under the Particular Facts.**

When assessing the adequacy, reasonableness, and appropriateness of a settlement agreement, courts "focus on the extent to which the decree is confined to the dispute between the parties and whether the decree adequately accomplishes its purported goal." *Leavitt*, 329 F. Supp. 2d at 71.  The role of the court in evaluating these factors, however, "is not to impose its own judgments as to how it would prosecute and resolve a particular case." *District of Columbia*, 933 F. Supp. at 51.  Rather, the court must determine whether the proposed consent decree is "reasonable from an objective point of view." *Id.*

For the same reasons discussed as to the Agreement's fairness, the Agreement also is objectively reasonable, adequate, and appropriate.  The central issue in the Complaint is whether the Service complied with the standards in the ESA and APA in promulgating the November 2021 final rule.  The Agreement reflects that the Service already has begun to consider whether areas designated under the November 2021 final rule should be excluded from the owl's critical habitat designation, *see* Section V.A., *supra*, a process that is expressly vested with the Service under the ESA. *Cf. Am. Forest Res. Council*, 946 F. Supp. 2d at 27 (applying "careful scrutiny" to a proposed consent decree that would allow the parties to "accomplish something through an act of this Court that they could not do on their own").  The Agreement memorializes the Service's commitment to reach certain benchmarks in that process by specific dates and makes those dates enforceable.  In return, upon the Court's approval, the Complaint will be dismissed with prejudice. *See* Section V.A., *supra*.  The Agreement does not displace the current regulatory framework while the Service conducts its public-facing rulemaking process. *See* Exhibit B (Decl. of G. Shultz ¶ 6).  In short,

11

the Agreement reasonably resolves this dispute by committing the Service to reconsider the challenged November 2021 final rule, while providing each party with some, but not all, of the outcomes that each seeks. If the Service ultimately determines to revise the owl's critical habitat designation, that decision will be accomplished through the notice and comment requirements of the APA and the ESA.  *Cf. Am. Forest Res. Council*, 946 F. Supp. 2d at 27.

> ### C.       The Agreement Serves the Public Interest.

"A settlement agreement which seeks to enforce a statute must be consistent with the public objectives sought to be attained by Congress." *Daimler AG*, 2021 WL 878894, at \*6.  "The Court's inquiry is limited," however, and its "function is not to determine whether the resulting array of rights and liabilities is the one that will best serve society, but only to confirm that the resulting settlement is within the reaches of the public interest." *Id.* (quoting *Microsoft*, 56 F.3d at 1460). The purpose of the ESA is to conserve threatened and endangered species.  16 U.S.C. § 1531(b); *see Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978) ("Congress intended endangered species to be afforded the highest of priorities").  The statute, however, permits the Service to revise a species' critical habitat designation "from time-to-time . . . as appropriate." 16 U.S.C. § 1533(b)(3)(A)(ii).  In doing so, the Service must "tak[e] into consideration the economic impact" of specifying any particular area as critical habitat, among other factors.  *Id.* § 1533(b)(2).  Consistent with the ESA, the Service will complete its analysis of the owl's critical habitat designation by a date certain.  The current critical habitat designation for the owl remains undisturbed pending completion of the rulemaking process.  *See* Exhibit B (Decl. of G. Shultz ¶ 6).  And, consistent with the procedures outlined in ESA Section 4(b)(2), the Service will engage in a notice-and-comment rulemaking process in which the public (including Defendant-Intervenors) will have an opportunity to provide input.

12

If the parties litigate the legal validity of the November 2021 final rule and Plaintiffs prevailed, Plaintiffs would seek vacatur of the November 2021 final rule.[4]  The APA states that

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or  otherwise not in accordance with law.

5 U.S.C. § 706(2)(A).  Here, however, the November 2021 final rule and its associated exclusion of areas from the critical habitat designation will remain in place until the Service reaches a final determination, if any, to be accomplished through a public notice and comment process consistent with the APA and the ESA.  *See* Exhibit B (Decl. of G. Shultz ¶ 6.

The Agreement also furthers the public interest by avoiding protracted litigation.  Voluntary settlement of civil litigation has traditionally been worthy of "high judicial favor." *Autera v. Robinson*, 419 F.2d 1197, 1199 (D.C. Cir. 1969).  Voluntary settlement of this dispute is in the public interest because it conserves judicial resources and allows the Service to focus on its mission to protect threatened and endangered species, rather than on litigation. *See Citizens for a Better Env't*, 718 F.2d at 1126; *Wright*, 503 F. Supp. 2d at 176.  More broadly, voluntary settlement of civil litigation is worthy of "high judicial favor" and thus consistent with the public interest. *Autera*, 419 F.2d at 1199; *see also Am. Forest Res. Council*, 946 F. Supp. 2d at 9 ("Generally it is not only the parties, but also the general public, that benefit from the time and monetary savings that result from voluntary settlements.").

---

[4]  It is the Department of Justice's position that the APA does not authorize a court to vacate an agency rule, but if vacatur is an available remedy, then like all equitable remedies it must be subject to traditional equitable limitations, including the principle of party-specific relief.  The Department recognizes, however, that in this Circuit, though a rulemaking need not necessarily be vacated, *see Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 151 (D.C. Cir. 1993), the presumptive remedy under the APA remains vacatur.  *Ctr. for Biological Diversity v. Regan*, 734 F. Supp. 3d 1, 62 (D.D.C.), *judgment entered*, 729 F. Supp. 3d 37 (D.D.C. 2024).

### D.    The Court Should Enter the Agreement Over Any Objections by Defendant-Intervenors.

While Defendant-Intervenors may be permitted to object to entry of the Agreement, they cannot unilaterally veto or modify it. "[I]t is well settled that 'the right to have its objections heard does not, of course, give the intervenor the right to block any settlement to which it objects.'" *District of Columbia*, 933 F. Supp. at 47 (quotation marks omitted) (citing cases). Nor must a consent decree include every party in a lawsuit, whether an original party, a party that was joined later, or an intervenor. *See Firefighters*, 478 U.S. at 528-29 ("It has never been supposed that . . . an intervenor[] could preclude other parties from settling their own disputes"). Once an intervenor has been given the opportunity to object to a proposed consent decree, the decree may be entered despite his objection. *See Citizens for a Better Env't*, 718 F.2d at 1117; *District of Columbia*, 933 F. Supp. at 51 (stating that it is not the intervenor's right to have the case decided in the manner it prefers). That a party does not have veto power over a settlement agreement is an issue of basic fairness: one party should not be able to preclude other parties from settling their own disputes and from minimizing the financial and other costs of litigation. *See Firefighters*, 478 U.S. at 528-29. In addition, if any intervening party were allowed to block entry of a consent decree to which the government is a party merely by objecting to an included term, it would "wreak havoc" upon the operation of the government. *District of Columbia*, 933 F. Supp. at 47 (citing *United States v. Ketchikan Pulp Co.*, 430 F. Supp. 83, 85 (D. Alaska 1977)).

The Court should reject Defendant-Intervenors' anticipated objections to the Agreement for at least two reasons. First, Defendant-Intervenors will suffer no legal prejudice as a result of the Agreement. *See Kellmer v. Raines*, 674 F.3d 848, 851 (D.C. Cir. 2012) ("In order to deny a motion for voluntary dismissal, a district court must find that dismissal will inflict clear legal prejudice on a defendant." (citation and quotation marks omitted)). Defendant-Intervenors have no

14

independent legal claims or causes of action in this lawsuit that would be compromised by the Agreement such that they would suffer legal prejudice. *See Piedmont Resol. LLC v. Johnston, Rivlin & Foley*, 178 F.R.D. 328, 331 (D.D.C. 1998) (defining "legal prejudice" as "prejudice to some legal interest, some legal claim, [or] some legal argument if the dismissal were granted." (citations and quotations omitted)). Indeed, the Court specifically imposed conditions on Defendant-Intervenors' participation in this lawsuit, holding among other things that they must confine their arguments to the existing claims in the case and refrain from interjecting new or collateral issues. Dkt. 35 at 6-7.

Second, while Defendant-Intervenors purport to have an interest in the critical habitat designation for the owl, the Agreement will not harm that interest. The Agreement leaves the current regulatory framework unaltered while the Service engages in its new rulemaking process. *See* Exhibit B (Decl. of G. Shultz ¶ 6). The Service has discretion to reconsider the owl's critical habitat designation regardless of this settlement. As stated in the Agreement, the agency already has begun work on a proposed rulemaking. Exhibit A at p.4; *see also* Exhibit B (Decl. of G. Shultz ¶ 6). Defendant-Intervenors will have an opportunity to participate in that process and comment on a proposed revised critical habitat rule, if any. *Citizens for a Better Env't*, 718 F.2d at 1121 (non-settling intervenors' interests were protected because they could influence the content of the proposed regulations by participating in the rulemaking process and then challenge the legality of the final rule in court). Indeed, it is difficult to imagine any harm that Defendant-Intervenors may suffer if the Court approves the Agreement, much less any harm that would be outweighed by the benefits of avoiding further litigation and allowing the Service to reevaluate the critical habitat designation to ensure that it complies with the ESA.

## VI.    CONCLUSION

The Court should find that the terms of the Agreement are fair, reasonable, and in the public interest. The Court should grant this motion, approve the Agreement, and dismiss the Complaint with prejudice.

Dated: May 14, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment & Natural Resources Division
NICOLE M. SMITH, Assistant Section Chief

/s/  Alison C. Finnegan
Alison C. Finnegan, Senior Trial Attorney
(Pennsylvania Bar No. 88519)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 532-3312; Fax: (202) 305-0275
alison.c.finnegan@usdoj.gov

Attorneys for Defendants U.S. Fish and Wildlife Service and Doug Burgum, in his official capacity as Secretary, U.S. Department of the Interior

/s/       Tyler G. Welti (with permission
TYLER G. WELTI (D.C. Bar No. 1015691)
VENABLE LLP
101 California Street, Suite 3800
San Francisco, CA 94111
415.653.3714
415.653.3755 (fax)
tgwelti@venable.com

Counsel for Plaintiffs, AMERICAN FOREST RE-SOURCE COUNCIL; ASSOCIATION OF O&C COUNTIES; DOUGLAS COUNTY, OREGON; LEWIS COUNTY, WASHINGTON; SISKIYOU COUNTY, CALIFORNIA; and SKAMANIA COUNTY, WASHINGTON

16

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2026, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Alison C. Finnegan