**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN FOREST RESOURCE COUNCIL, *et al.*,

      *Plaintiffs,*

      v.

U.S. FISH & WILDLIFE SERVICE, *et al.*,

      *Defendants,*

      and

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

      *Defendant-Intervenors.*

Case No. 1:25-cv-01048-RJL

**DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' AND DEFENDANTS' JOINT MOTION FOR APPROVAL OF STIPULATED SETTLEMENT AGREEMENT [ECF 46]**

**INTRODUCTION**

Plaintiffs American Forest Resource Council ("AFRC"), *et al.*, and Federal Defendants ask this Court to approve a Stipulated Settlement Agreement ("Agreement") resolving AFRC's challenge to the U.S. Fish and Wildlife Service's ("Service") November 2021 critical habitat designation for the northern spotted owl. ECF No. 46. The Agreement would require the Service to fast-track consideration of additional exclusions from northern spotted owl critical habitat. To accomplish this, the Service would need to redirect its already overextended resources from statutorily mandated conservation initiatives to a purely discretionary effort. While the Service is entitled to reconsider its critical habitat rule, prioritizing reconsideration over other obligatory conservation actions violates the language of the Endangered Species Act ("ESA"), its purpose, and this Court's own finding that the ESA mandates the Service prioritize species listings and critical habitat designation over revisions to existing critical habitat. Moreover, prioritizing this deregulatory action is inappropriate

Def.-Ints.' Opp. to Plfs.' and Defs.' Mot. for Approval of Stipulated Settlement Agreement    1

considering the species' precarious state and the importance of habitat protection to its continued survival. AFRC and the Service ask this Court to put its imprimatur on that reprioritization. The Court should decline this invitation as the Agreement is thus not fair, reasonable, appropriate under the facts, or in the public interest. For these reasons, Defendant-Intervenors respectfully ask the Court to deny the motion to approve the Agreement.

## BACKGROUND

The northern spotted owl *(Strix occidentalis caurina)* ("Owl") is a medium-sized, chestnut brown owl that inhabits the complex old-growth forests of the Pacific Northwest. Owls require large, unfragmented swaths of old forest habitat with mature, closed canopies for essential nesting, roosting, and foraging activities. 77 Fed. Reg. 71,876, 71,886 (Dec. 4, 2012). A habitat specialist, the Owl's dependence on disappearing mature and old-growth forests is the primary cause of its decline over the past century. 55 Fed. Reg. 26,114, 26,175–76 (June 26, 1990). The Service identified widespread commercial timber harvest throughout the twentieth century as the primary factor leading to the Owl's original listing as threatened. *Id.*

This listing did not, however, arrest the species' decline. Owl populations are "in a precipitous decline" and continue to fall at an annual rate of 5.3 percent across their range. 86 Fed. Reg. 62,606, 62,637 (Nov. 10, 2021). Owl populations in Oregon and Washington have declined over 50 percent since 1995—after the species was listed under the ESA—with several populations declining over 70 percent. *Id.* This led the Service to conclude, in 2020, that the Owl is now in danger of extinction throughout all of its range, warranting "uplisting" from a "threatened" to "endangered" species under the ESA. 85 Fed. Reg. 81,144, 81,144–45 (Dec. 15, 2020)*.*

Habitat loss remains one of the primary drivers of this decline. Regulatory mechanisms have failed to prevent the continued loss of the Owl's mature and old-growth habitat on non-Federal lands, where habitat has "decreased considerably over the past two decades." *Id.* The Owl is now also forced to compete for resources with the invasive barred owl on the dwindling areas of remaining habitat, with continued habitat loss increasing overlap and competition

Def.-Ints.' Opp. to Plfs.' and Defs.' Mot. for Approval of Stipulated Settlement Agreement       2

between the two species. 86 Fed. Reg. at 62,637. Maintaining remaining Owl habitat, particularly habitat on federal lands, and managing it for the benefit of the species is now more imperative than ever.

In November 2021, the Service revised its critical habitat designation for the species in the rule contested here. 86 Fed. Reg. 62,606 ("November 2021 Rule"). The Service, following the ESA's best available science directive, designated 9.37 million acres of critical habitat for the Owl. *Id.* at 62,641. The Service excluded 204,294 acres from the designation, concluding the benefits of excluding these areas outweighed those of designating the areas as critical habitat. *Id.* at 62,644–45. At that time, the Service also reconsidered the merits of a more expansive exclusion advanced in a prior critical habitat rule. 86 Fed. Reg. 4,820 (Jan. 15, 2021) ("January 2021 Rule"). The Service concluded this broader exclusion would not only jeopardize the species, but "would result in the extinction of the owl." 86 Fed. Reg. at 62,656.

Threats to the Owl's habitat have only increased since the Service issued its November 2021 critical habitat rule. The Bureau of Land Management recently announced its intent to revise its resource management plans for over 2.4 million acres of public lands in the species' range to return timber harvest to the "historically higher" "maximum productive capacity" levels that led to the Owl's initial ESA listing. 91 Fed. Reg. 8,017 (Feb. 19, 2026). The Forest Service has also proposed amendments to the Northwest Forest Plan, the large-scale land management plan developed to provide for the Owl's conservation. 88 Fed. Reg. 87,393 (Dec. 18, 2023). These processes are being carried out under this administration's directive to "fully exploit" federally-managed public lands for timber production. Exec. Order No. 14,225, 90 Fed. Reg. 11,365 (Mar. 6, 2025).

## STANDARD OF REVIEW

"Approving a consent decree is a 'judicial act', and the Court undertakes it with care." *United States v. Wells Fargo Bank, NA*, 891 F. Supp. 2d 143 (D.D.C. 2012) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995)). "[A] district court's 'authority to adopt a consent decree comes only from the statute which the decree is intended to enforce.'"

*Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1125 (D.C. Cir. 1983) (quoting *Sys. Fed'n No. 91, Ry. Emps.' Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 651 (1961)). This means that "the focus of the court's attention in assessing the agreement should be the purposes which the statute is intended to serve, rather than the interests of each party to the settlement." *Id*.

Before approving a consent decree, a court must determine that it is fair, reasonable, and in the public interest. *See id.* at 1126. "[A] court should enter a consent decree affecting the public interest only after considering the substantive validity of the decree." *Adams v. Bell*, 711 F.2d 161, 170 n.40 (D.C. Cir. 1983) (en banc). To that end, a consent decree "must spring from, and serve to resolve, a dispute within the court's subject-matter jurisdiction; must come within the general scope of the case made by the pleadings; and must further the objectives of the law upon which the complaint was based." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004).

Furthermore, when a proposed consent decree is in tension with statutory requirements, the proposed remedy warrants "careful scrutiny." *See Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 27 (D.D.C. 2013). In such circumstances, to ensure the public's interest in proper process and the substantive provisions of the underlying statute are furthered, the Court must be "reasonably confident that there is a sound legal basis" for the proposed action. *Id.* at 30.

**ARGUMENT**

**I.     APPROVAL OF THE AGREEMENT IS NOT FAIR, REASONABLE, APPROPRIATE UNDER THE FACTS, OR IN THE PUBLIC INTEREST.**

This Court should decline to enter the proposed Agreement because it is not fair, reasonable, appropriate under the facts, or in the public interest. Instead of furthering the objectives of the ESA, and therefore the public's interest in the substantive provisions of the statute, the Agreement requires the Service to prioritize a purely discretionary task—the reconsideration of an existing critical habitat designation—over long-overdue statutorily mandated activities. The Service, already operating with severely constrained resources, would only be able to meet the Agreement's expedited timeline by diverting resources away from tasks Congress, and this Court, have deemed of higher priority. *Biodiversity Legal Found. v. Norton*,

Def.-Ints.' Opp. to Plfs.' and Defs.' Mot. for Approval of Stipulated Settlement Agreement     4

285 F. Supp. 2d 1, 14–15 (D.D.C. 2003). This is not only contrary to the ESA, but is also inappropriate under the facts considering the Owl's increasingly precarious status, the fact that it is itself awaiting uplisting to endangered status, and the Service's prior finding that additional exclusions would lead to the species' extinction. The Agreement is thus not fair, reasonable, appropriate, or in the public interest and should not be approved. *See Citizens for a Better Environment*, 718 F.2d at 1126.

A. **The Agreement's Prioritization of Habitat Revisions Over Conserving Imperiled Species Violates the ESA's Purpose and is Thus Not in the Public Interest.**

1. *The ESA requires the Service to prioritize listing species and designating critical habitat over revisiting existing critical habitat designations.*

The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 689 (1995) (quoting *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978) ("*TVA*")). The statute was enacted in 1973 in response to the dramatic rise and severity of human-caused threats to wildlife. *TVA*, 437 U.S. at 176–77 (discussing ESA legislative history). At the time of its enactment, habitat destruction was singled out as the greatest threat to wildlife and cause for species extinction. *Id.* at 179. In response to this threat, Congress identified the need to "*devote whatever effort and resources were necessary* to avoid further diminution of national and worldwide wildlife resources." *Id.* at 177 (quoting George Cameron Coggins, *Conserving Wildlife Resources: An Overview of the Endangered Species Act of 1973*, 51 N.D. L. Rev. 315, 321 (1975)) (emphasis in original). This need is embodied in the ESA, which specifically requires "the use of *all methods and procedures which are necessary* to bring any endangered species or threatened species to the point at which" the species has recovered and ESA protection is no longer necessary. 16 U.S.C. § 1532(3) (emphasis added); *see also id*. § 1531(b). The statute thus represents Congress's "'plain intent' to halt and reverse the trend toward extinction, whatever the cost," and prioritize the conservation of endangered species over all other interests. *TVA*, 437 U.S. at 184–85.

Through the ESA, Congress determined preventing species' extinction is of paramount interest to the public. *Conserve Sw. Utah v. U.S. Dep't of the Interior*, No. 26-cv-317-RDM, 2026 WL 569034, at *21 (D.D.C. Mar. 1, 2026). This interest is fulfilled through several mandatory duties the ESA imposes on the Service and other federal agencies. For example, the statute creates a specific timeline for the species listing process. The Service must, to the maximum extent practicable, make an initial finding on a petition to list a species within 90 days after its receipt. 16 U.S.C. § 1533(b)(3)(A). A second finding, on whether listing is warranted, is required within 12 months of the petition's receipt. *Id.* § 1533(b)(3)(B). The ESA also requires the Service to designate critical habitat at the time of listing to the maximum extent prudent and determinable. *Id.* § 1533(a)(3). The Service must then develop and implement recovery plans for listed species, unless it finds a recovery plan will not benefit the species. *Id*. § 1533(f)(1). The Service is required to use all programs the agency administers to further the conservation of listed species, and, through consultation with other federal agencies, ensure that any action authorized, funded, or carried out by federal agencies is not likely to jeopardize the continued existence of listed species or destroy or modify species' critical habitat. *Id.* § 1536(a)(2).

Revisions to critical habitat, however, are not mandatory. While the ESA *permits* the Service to revise critical habitat designations, these revisions are discretionary. The statutory language is, in fact, the model of discretionary authority. It provides the Service "may" revise these designations "from time-to-time" and only "as appropriate."[1] *Id.* § 1533(a)(3)(A)(ii). The exclusion of areas from critical habitat is also purely discretionary. *Id.* § 1533(b)(2). As this Court has found, this language reflects a clear hierarchy of priorities under the ESA: Congress intended for the Service to prioritize statutorily mandated duties, such as listing actions and critical habitat designation, over revising or excluding areas from existing critical habitat. *Biodiversity Legal Found.*, 285 F. Supp. 2d at 14–15. Thus, while the Service may reconsider

---

[1] The Service is required to meet certain deadlines in response to a petition to revise designated critical habitat. 16 U.S.C. §§ 1533(b)(3)(D)(i)–(ii). However, these deadlines do not apply where, as here, the Service voluntarily undertakes such revisions. *Id.*

critical habitat designations or exclude areas from critical habitat, it cannot prioritize this over, or do so at the expense of, other statutorily mandated duties. *Id.*

Despite the ESA's clear hierarchy, AFRC and Defendants ask this Court to not only allow, but *require*, FWS to use its limited resources contrary to Congress' intent by prioritizing revisions to the Owl's critical habitat over other overdue statutorily mandated actions. The Agreement AFRC and Defendants ask this Court to approve would commit the Service to undertaking a resource-intensive rulemaking on a tight timeline, as it provides the Service less than four months to prepare a draft revised critical habitat rule for publication in the Federal Register. Agreement, ¶¶ 1–2. The Service, already stretched beyond capacity by pre-existing workload and recent staffing cuts, will need to defer long-overdue protections for endangered and threatened species, including meeting mandated listing and critical habitat designation deadlines, to instead funnel resources to the discretionary task of revisiting—and likely weakening—critical habitat protections for the precipitously declining Owl.

It is undisputed that the Service faces significant workload challenges. According to the agency's National Listing Workplan, which reflects its prioritization and schedule for completing pending listing and critical habitat actions, nearly 500 species currently are awaiting consideration for listing, with an average 12-year delay between when a species is petitioned for listing and a final determination is made.[2] Another 83 imperiled species are awaiting critical habitat designations. The Service is now tasked with addressing this backlog with a diminished staff after this Administration cut the workforce by 18 percent in the past year alone, resulting in the loss of 900 biologists.[3]

Critically, the Service has already missed statutorily mandated and court-ordered deadlines for many of these pending actions. The agency, for example, missed the ESA-

---

[2] U.S. Fish & Wildlife Service, *National Listing Workplan Prioritization*, https://www.fws.gov/project/national-listing-workplan-prioritization (last visited May 31, 2026).
[3] Evan Reisner, "Federal wildlife agency loses nearly 20% of staff in a year," SFGATE (Dec. 17, 2025) https://www.sfgate.com/national-parks/article/us-fish-wildlife-staffing-cuts-trump-21246639.php [https://perma.cc/97H8-5CJ3].

prescribed deadlines for 77 of the 83—or 93 percent—of the species currently awaiting critical habitat designations, and thus now must meet court-ordered deadlines for designating critical habitat for those species. Yet the Service is now failing to meet even these deadlines. For example, just two months ago, the Service failed to meet the court-ordered deadline to designate critical habitat for four endangered species of freshwater mussels. *See* Defendant's Motion to Modify Settlement Agreement for an Extension of Time, *Ctr. for Biological Diversity v. Burgum*, No. 1:18-cv-1568-TN, ECF No. 36 (D.D.C. Jan. 9, 2026). The species are critically imperiled, have awaited critical habitat designation since their listing in 2012, and only secured a deadline for critical habitat designation after a stipulated settlement agreement in 2019. *Id.* at 4. In a declaration to the court, the Service's Assistant Director for the Ecological Services Program asserted that additional time was necessary due to the burden of six other impending court-ordered deadlines within just 90 days. Decl. of Gina Shultz at 2, *Ctr. for Biological Diversity v. Burgum*, No. 1:18-cv-1568-TN, ECF No. 36-1 (D.D.C. Jan. 9, 2026).

Likewise, the Service recently sought a six-month extension to complete a listing determination for the streaked horned lark, citing severe staffing shortages and an overwhelming workload within the Oregon Fish and Wildlife Office ("OFWO")—the same field office tasked with managing the Owl. *See* Exhibit 1, Declaration of Kate Norman at 4, *Ctr. for Biological Diversity v. Burgum*, No. 3:23-cv-00150-AN, ECF No. 47 (D. Or. May 1, 2026); *see also* Decl. of Gina Shultz, ECF No. 46-3, ¶ 3 (noting OFWO is responsible for Owl conservation and classification-related decisions). In that case, the Service argued that a 24 percent reduction in OFWO staff in 2025 rendered the court-ordered deadline "infeasible." *Id.* at 4, 7. Yet, under the Agreement, that same field office would be required to prioritize an otherwise discretionary revision of the Owl's critical habitat instead of focusing these resources on completing this listing determination and other pending actions. This is contrary to the ESA. *Biodiversity Legal Found.*, 285 F. Supp. 2d at 14–15 (finding Congress intended the Service to prioritize listing determinations over revising critical habitat).

Moreover, the Service has openly stated that critical habitat actions are complex and

Def.-Ints.' Opp. to Plfs.' and Defs.' Mot. for Approval of Stipulated Settlement Agreement        8

require additional agency coordination. *See* 85 Fed. Reg. at 81,146. The Agreement therefore adds resource-intensive work to the Service's already overwhelming workload when the agency itself has said that it already lacks the resources to uplist the owl to endangered status because of "higher priority" actions. *Id.* at 81,144. Thus, the Service's prioritization of revising the Owl's critical habitat, rather than proceeding with the uplisting of the Owl itself from threatened to endangered, is inconsistent with its obligations under the ESA.

In sum, despite the ESA tasking the Service with numerous statutorily mandated duties to advance the statute's core purpose of halting and reversing the trend toward extinction, *TVA*, 437 U.S. at 184–85, and the Service's existing backlog of mandatory listing and critical habitat actions for which it already lacks the resources to undertake, AFRC and Defendants invite this Court to use its authority to help them prioritize a discretionary, likely deregulatory action that does not further the ESA's objectives. This Court must decline the invitation as it is contrary to the structure and purpose of the ESA, *Biodiversity Legal Found.*, 285 F. Supp. 2d at 14–15, thus does not further the "public's interest in proper process and in the substantive provisions of the ESA." *Ashe*, 946 F. Supp. 2d at 27.

2.   *Prioritizing revision to NSO critical habitat is not appropriate under the facts.*

Prioritizing reconsideration of NSO critical habitat is not only inconsistent with the ESA's structure and purpose, but it is also not appropriate under the facts due to the undisputed importance of habitat protection to conserving the owl and the species' current trajectory toward extinction. While the agency states that it must "reevaluate the critical habitat designation to ensure it complies with the ESA," it does not so much as "hint as to how exactly, in [its] view, the critical habitat designation may be deficient" under the statute or in light of the Owl's conservation needs. *Ashe*, 946 F. Supp. 2d at 30–31.

The Owl's increasingly precarious status is undisputed, and the ESA permits exclusions from critical habitat only where exclusion will not, based on the best available science, result in the extinction of the species. 16 U.S.C. § 1533(b)(2). The Service has already, twice, determined excluding large areas of BLM-managed public lands was unwarranted because "they play an

Def.-Ints.' Opp. to Plfs.' and Defs.' Mot. for Approval of Stipulated Settlement Agreement    9

essential role in the conservation of the species," and such exclusions would "with reasonable certainty" lead to the species' extinction. 77 Fed. Reg. at 72,007; 86 Fed. Reg. at 62,656. The Service has not, and does not here, contest this finding.

Nor could it. Owl populations have continued to decline precipitously since the species was listed as threatened, with habitat loss remaining a primary threat to the species. Indeed, the Service's November 2021 Rule found that state protection efforts on non-federal lands had failed to prevent significant loss of the species' mature and old-growth forest habitat. 86 Fed. Reg. at 62,606–07. The Owl's ongoing decline and loss of habitat is precisely why the Service found in 2020 that the agency should uplist the species from threatened to endangered, 85 Fed. Reg. at 81,144–45—an action that, again, the agency has said it cannot yet take due to limited resources and a strained workload, both of which would be exacerbated should this Court approve the Agreement.

Further, federal efforts to conserve the owl are currently in jeopardy. BLM, for example, recently announced its intent to revise its Northwestern and Coastal Oregon and Southwestern Oregon Resource Management Plans. 91 Fed. Reg. 8,017. These plans govern management of over 2.4 million acres, including nearly all Owl habitat on BLM-managed public lands in Oregon. *Id.* BLM has announced its intent to revise the plans to allow for the "historically higher levels" and "maximum productive capacity" of timber harvest that contributed to the Owl's ESA listing. *Id.* These are the same federal lands the Service has repeatedly found essential to the Owl's conservation. *See, e.g.,* 77 Fed. Reg. at 72,007; 86 Fed. Reg. at 62,637–38. The Forest Service has also announced its intent to rescind the Roadless Rule, which currently protects large areas of Owl habitat from road-building and timber harvest, 90 Fed. Reg. 42,179 (Aug. 29, 2025), and has proposed amendments to the Northwest Forest Plan, which governs management of much of the public lands within the species' range.[4] These pending actions, undertaken

---

[4] U.S. Forest Service, *Forest Service Announces Next Steps and Updated Timeline for Northwest Forest Plan Amendment*, https://www.fs.usda.gov/r06/newsroom/releases/forest-service-announces-next-steps-and-updated-timeline-northwest-forest (last visited June 5, 2026).

against the backdrop of an executive directive to expand timber production, *see* Exec. Order No. 14,225, 90 Fed. Reg. 11,365 (Mar. 6, 2025), heighten the risk of additional habitat loss and underscore the importance of maintaining existing critical habitat protections for the Owl.

These facts make approval of the Agreement especially inappropriate. The ESA requires the Service to use "all methods and procedures" necessary to recover listed species and to conserve the ecosystems on which they depend. 16 U.S.C. §§ 1531(b), 1532(3). For the owl, habitat protection remains indispensable to halting the species' trajectory toward extinction. In light of the Owl's continued decline, the Service's own finding that broad exclusions from federal lands would result in extinction, and ongoing federal efforts to increase timber harvest across Owl habitat, an agreement requiring the Service to prioritize discretionary reconsideration of existing critical habitat protections is "not appropriate under the particular facts" and does not serve the public interest. *Ashe*, 946 F. Supp. 2d at 27 (citing *Citizens*, 718 F.2d at 1126).

## II.   AT MINIMUM, THE COURT SHOULD DECLINE TO INCORPORATE THE AGREEMENT INTO AN ORDER OR RETAIN JURISDICTION OVER IT.

Plaintiffs and Federal Defendants seek more than dismissal of this case. They ask the Court to approve the Agreement, incorporate its terms into an order, and retain jurisdiction to oversee compliance with a schedule for future rulemaking. But retention of jurisdiction over a settlement agreement is discretionary. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994). And before entering an order that would place future agency rulemaking under court supervision, the Court must determine that the Agreement is consistent with the governing statute and the public interest. *Citizens for a Better Env't*, 718 F.2d at 1125–26; *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004); *Ashe*, 946 F. Supp. 2d at 30.

Paragraph 5 confirms why retained jurisdiction is inappropriate. The Agreement requires Plaintiffs to seek abeyance of their pending motion to enforce the April 2020 settlement agreement in *Carpenters Indus. Council v. Zinke*, No. 13-cv-00361-RJL, until the Service meets the deadlines in this Agreement. Agreement ¶ 5. But Plaintiffs agree to seek withdrawal of that enforcement motion only if the Service issues a final revised critical habitat rule. *Id.* If the

Def.-Ints.' Opp. to Plfs.' and Defs.' Mot. for Approval of Stipulated Settlement Agreement      11

Service concludes after notice and comment that additional exclusions are unwarranted and withdraws the proposed rule, Paragraph 5 does not require Plaintiffs to withdraw the *Carpenters* enforcement motion. That structure preserves litigation pressure favoring issuance of a final revised rule and weighs against court approval of the Agreement.

The Service does not need a court-approved settlement to proceed with a rulemaking it has already begun. *See* Shultz Decl., ECF No. 46-3, ¶ 5. If the Service believes reconsideration of critical habitat exclusions is warranted, it may proceed under the ESA and APA. The Court should decline to incorporate the Agreement into an order or retain jurisdiction over a settlement that links this case, separate enforcement proceedings, and a future APA rulemaking affecting critical habitat for a threatened species.

## CONCLUSION

For the reasons discussed above, Defendant-Intervenors ask the Court to reject the proffered Stipulated Settlement Agreement. At minimum, the Court should decline to incorporate the Agreement into an order or retain jurisdiction over it.

Date:    June 5, 2026        Respectfully submitted,

/s/ David T. Woodsmall
DAVID T. WOODSMALL (Admitted *pro hac vice*)
SANGYE INCE-JOHANNSEN (Admitted *pro hac vice*)
WESTERN ENVIRONMENTAL LAW CENTER
120 Shelton McMurphey Boulevard, Suite 340
Eugene, OR 97401
Phone: (971) 285-3632
          (541) 778-6626
Email: woodsmall@westernlaw.org
          sangyeij@westernlaw.org

*Counsel for Defendant-Intervenors:*
*Oregon Wild, Bird Alliance of Oregon, and*
*Klamath Forest Alliance*

/s/ Chelsea Stewart-Fusek
CHELSEA STEWART-FUSEK (D.C. Bar No. OR0029)
CENTER FOR BIOLOGICAL DIVERSITY

P.O. Box 11374
Portland, OR 97211
Phone: (971) 717-6425
Email: cstewartfusek@biologicaldiversity.org
*Counsel for Defendant-Intervenor:*
*Center for Biological Diversity*

/s/ Susan Jane M. Brown
SUSAN JANE M. BROWN (Admitted *pro hac vice*)
SILVIX RESOURCES
4107 NE Couch Street
Portland, OR 97232
Phone: (503) 680-5513
Email: sjb@silvix.org
*Counsel for Defendant-Intervenor:*
*Klamath Siskiyou Wildlands Center, Cascadia*
*Wildlands, Conservation Northwest, and*
*Environmental Protection Information Center*