**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN FOREST RESOURCE COUNCIL, et al., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No: 1:25-cv-01048-RJL |
| U.S. FISH & WILDLIFE SERVICE, et al., | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) | |
| Defendant-Intervenors. | ) ) | |

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION FOR APPROVAL OF
STIPULATED SETTLEMENT AGREEMENT**

**I.      INTRODUCTION**

It is settled law that an intervenor does not have power to veto an agreement between other parties that settles their dispute and minimizes the financial and other costs of litigation. Yet that is exactly what Defendant-Intervenors ("Intervenors") seek to do. The U.S. Fish and Wildlife Service ("the Service") and Plaintiffs have reached a Stipulated Settlement Agreement ("Agreement"), *see* Dkt. 46-2, and have asked the Court to approve it and dismiss the Complaint with prejudice. Intervenors' Opposition to the Joint Motion for Approval of the Agreement ("Opp."), Dkt. 48, fails to address most of the factors that the Court must consider when evaluating a settlement and instead asks the Court to substitute its judgment for that of the parties. Their positions lack legal support, disregard the facts, and should be rejected.

The Agreement negotiated by the Service and Plaintiffs is procedurally and substantively fair.  Intervenors make no effort to address the relevant legal standard on this factor and it is easily resolved in favor of settlement.  Nor have Intervenors shown that the Agreement fails to satisfy the factors of adequacy, reasonableness, and appropriateness.  As Intervenors acknowledge, the Endangered Species Act ("ESA") unambiguously affords the Service with the discretion to revise a critical habitat designation. The Agreement does no more than establish a schedule for that reconsideration through notice-and-comment rulemaking while preserving the Service's discretion to issue a final revised rule or withdraw the proposal; that procedural commitment is objectively reasonable, appropriate, and adequate.

Finally, the Agreement furthers the public interest.  While Intervenors characterize the Agreement as proposing a "deregulatory action" that is inconsistent with the ESA's statutory purpose, Opp. at 1, 9, they overlook several key facts.  First, the current critical habitat designation remains in place now and will remain in place through any final determination.  Second, the northern spotted owl, *Strix occidentalis caurina* ("owl"), retains its current listing status as a threatened species and has enjoyed most of the protections afforded to endangered species (as identified in 50 C.F.R. § 17.31) since it was first listed in 1990.  *See* Determination of Threatened Status for the Owl*,* 55 Fed. Reg. 26114, 26193 (June 26, 1990).  Third, Congress provided the Service the discretion and authority under the ESA to undertake the work to revise the owl's critical habitat designation.  It will do so in a rulemaking process under the ESA and the Administrative Procedure Act ("APA"), allowing the public and Intervenors to participate and promote their interests by influencing the content of the rulemaking process.  Indeed, Intervenors fail to specify any legal prejudice that they would suffer from the Agreement. Their resource-diversion theory is speculative, contradicted by facts, and contrary to the public's interest in settlement. If not for the

Agreement, the Service and Plaintiffs would be forced to devote significant resources to the litigation, taxing the resources of the parties and the Court.  Continued litigation over a critical habitat rule that the Service is already reconsidering is not in the interest of the parties, the Court, or the public.  The Agreement resolving this litigation, like all voluntary settlements of civil litigation, is worthy of "high judicial favor."  *Autera v. Robinson*, 419 F.2d 1197, 1199 (D.C. Cir. 1969).  In short, Intervenors' position is baseless.  The Court should grant the Motion for Approval.

## II.   ARGUMENT

### A.   Intervenors Fail To Show The Agreement Is Not Fair, Adequate, Or Reasonable.

A court must determine whether a settlement "is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties."  *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).  In determining whether a settlement is fair, the Court must evaluate procedural and substantive fairness, considering the nature of the negotiating process and whether the settlement incorporates "concepts of corrective justice and accountability."  *Env't Def. Ctr. v. Leavitt*, 329 F. Supp. 2d 55, 70 (D.D.C. 2004); *see also United States v. Dist. of Columbia*, 933 F. Supp. 42, 47-48 (D.D.C. 1996).

Intervenors summarily argue that the Agreement is not fair, adequate, or reasonable, Opp. at 2, 4, without addressing these three factors individually.  With respect to fairness, they make no challenge to the "negotiating process," nor do they offer any critique of "its candor, openness, and bargaining balance."  *See Dist. of Columbia*, 933 F. Supp. at 48 (citation omitted).  Intervenors are silent about the Agreement's incorporation of "concepts of corrective justice and accountability," *Leavitt*, 329 F. Supp. 2d at 70, and make no mention of the fact that the Agreement provides each party with some, but not all, of the outcomes that it seeks.  In short, Intervenors offer no argument regarding the fairness factor, nor do they dispute the facts or arguments that Plaintiffs and the

Service raised in their opening memorandum. *See* Mem. in Supp. of Joint Mot. for Approval at 8-10 (Dkt. 46-1). The Agreement reflects a balancing of legal risk to arrive at a resolution and, accordingly, the Court should find that it is fair, adequate, and reasonable.

**B.      Intervenors Fail To Show The Agreement Is Not An Appropriate And Reasonable Resolution Of This Lawsuit.**

Intervenors' argument that the Agreement is not appropriate or reasonable because the Service ought to prioritize other statutory functions under the ESA is irrelevant and should be disregarded. Opp. at 9-11. Intervenors acknowledge that "the Service is entitled to reconsider its critical habitat rule." *Id.* at 1. That concession leaves no dispute that the ESA grants the Service the authority to revise a critical habitat designation and that the Agreement is appropriate. Intervenors' request to subject the Agreement to heightened scrutiny is thus misplaced, and the Court should decline to apply this standard. *Cf. Am. Forest Res. Council v. Ashe*, 946 F. Supp. 2d 1, 27 (D.D.C. 2013) (applying "careful scrutiny" to a proposed consent decree that would allow the parties to "accomplish something through an act of this Court that they could not do on their own"), *aff'd,* 601 F. App'x 1 (D.C. Cir. 2015).

Instead, the Court must review the Agreement under the ordinary standard to determine whether it is "reasonable from an objective point of view." *Dist. of Columbia*, 933 F. Supp. at 51. The Court's role "is not to impose its own judgments as to how it would prosecute and resolve a particular case." *Id*. The Agreement readily meets this standard. The Complaint alleges that the Service failed to comply with the standards in the ESA and the APA in promulgating the November 2021 final rule. *See generally* Dkt. 1 ¶¶ 87-102. The Agreement reflects that the Service has begun work to consider whether areas designated under the November 2021 final rule should be excluded from the owl's critical habitat designation. Agreement at 4. The Agreement memorializes the Service's commitment to reach certain benchmarks in that process by specific dates and makes

those dates enforceable.  *Id*. ¶¶ 1-2.  If the Court approves the Agreement, Plaintiffs will dismiss the Complaint with prejudice.  *Id*. ¶ 6.  The Agreement does not obligate the Service to reach any substantive result or limit the discretion afforded to the Service by the ESA, the APA, or general principles of administrative law regarding the procedures to be followed in making any determination.  *Id.* at 4 & ¶¶ 1, 9.  These commitments are reasonable by any measure.  *See In re Idaho Conservation League*, 811 F.3d 502, 514-16 (D.C. Cir. 2016) (finding a settlement agreement reasonable over the intervenor's objection where it merely prescribed the date by which a regulation could occur, left the substance of any rulemaking to the agency, and preserved the ability of affected parties to participate in, and ultimately challenge, any final action). Indeed, as discussed below, the Service has entered into numerous settlement agreements with environmental groups that obligate it to act by agreed upon deadlines.  *See infra*, at 13.

Intervenors' suggestion that the Service must explain why the current critical habitat designation is deficient before it may consider whether to exclude areas from the owl's critical habitat designation rests on inapposite authority.  *See* Opp. at 9 (citing *Ashe*, 946 F. Supp. 2d 1). In *Ashe*, the proposed consent decree provided for vacatur of the marbled murrelet critical habitat designation while the Service reconsidered the issue during a five-year remand period.  946 F. Supp. 2d at 27.  The *Ashe* court subjected that proposed consent decree to heightened scrutiny and departed from the "long-standing rule . . . that a district court has power to enter a consent decree without first determining that a statutory violation has occurred" ***because*** the consent decree "would allow the parties to bypass the notice and comment requirements of the APA and ESA." *Id.* (quoting *Citizens for a Better Env't*, 718 F.2d at 1125-26).

By contrast, here, the Agreement requires the Service to follow the notice and comment requirements in the APA and the ESA.  The critical habitat designation set forth in the November

2021 final rule will remain in effect (1) while the Service carries out its public-facing rulemaking process and (2) unless and until the Service makes a final determination to revise the November 2021 rule. Shultz Decl. ¶ 6 (Dkt. 46-3); *see also* Agreement ¶¶ 1-2, 9. Moreover, the Service already has begun work to determine whether any areas designated as critical habitat for the owl under the November 2021 final rule should be considered for exclusion, in part due to this lawsuit. *See* Shultz Decl. ¶ 5; Exhibit C (Decl. of J. Tirpak ¶ 7). Thus, the "procedural safeguards" that were missing in *Ashe* that caused the district court to scrutinize that consent decree are, in fact, present here. 946 F. Supp. 2d at 27. Given these circumstances, Intervenors' suggestion that the Court can only find the Agreement appropriate if the Service provides a "hint" as to how the November 2021 final rule may be deficient finds no support in *Ashe*. *See* Opp. at 9. Their argument also conflicts with the well-established rule that "a district court has power to enter a consent decree without first determining that a statutory violation has occurred." *Citizens for a Better Env't*, 718 F.2d at 1125-26 (citation omitted). Like many settlement agreements with federal agencies, the Agreement is a negotiated compromise that does not require either the Service to admit fault or Plaintiffs to admit any weaknesses in their position. *See United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) ("[I]n exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation."). And Intervenors' position that a confession of error is required is particularly inappropriate in this situation, where the ESA grants the Service discretion to revise a critical habitat designation "from time-to-time . . . as appropriate." 16 U.S.C. § 1533(a)(3)(A)(ii).

Citing *Biodiversity Legal Foundation v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003), Intervenors also argue that the Agreement is not appropriate because the ESA requires the Service to prioritize listing determinations over revisions to critical habitat determinations. *See* Opp. at 9-

10.  Again, however, Intervenors rely on case law that simply does not apply here.  The plaintiffs in the *Biodiversity* case petitioned the Service to revise the critical habitat designation of the Cape Sable seaside sparrow, a bird listed as endangered under the ESA.  285 F. Supp. 2d at 6.  After the Service failed to issue a timely 12-month finding on that petition, and then determined that the revision, while warranted, did not take priority over evaluating species that may meet the definition of an endangered species or a threatened species but were not yet listed as such, the plaintiffs sued, alleging unreasonable delay under APA Section 706(1).  *Id*. at 6-7.  As part of its analysis of whether the delay was reasonable, the district court noted that the ESA's language "appears to reflect a general congressional priority to listing actions over revisions to critical habitat."  *Id*. at 14-15.  Ultimately, however, the district court declined to find the delay unreasonable, noting in part that "respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities."  *Id*. at 12; *accord In re Barr Labs*., 930 F.2d 72, 74 (D.C. Cir. 1991).

Unlike the plaintiffs in *Biodiversity*, who simply sought to enforce a statutory deadline, Intervenors urge the Court to "assume command" over the Service's choice of priorities and on that basis deny approval of the Agreement, thus forcing the Service and other parties to devote their limited resources to litigation over other priorities.  *See Biodiversity*, 285 F. Supp. 2d at 12. The Court should be "loath to rush in to manage the details of [the Service's] rulemaking procedure" because the Service not only possesses "enormous technical expertise [the Court] lack[s], but must juggle competing rulemaking demands on its limited scientific and legal staff." *Pub. Citizen Health Rsch. Grp. v. Brock*, 823 F.2d 626, 629 (D.C. Cir. 1987) (per curiam); *see also Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 808 (9th Cir. 2008) (noting the Service "enjoys considerable scheduling discretion in the management of listing and research

priorities"). Here, the Service is best positioned to evaluate the competing demands associated with its statutory responsibilities and whether those duties allow it to negotiate an appropriate resolution to litigation that is likely to be costly and burdensome. In fact, it does so on a regular basis. *See* Exhibit C (Decl. of J. Tirpak ¶ 5). As the Service explains in the attached declaration, it anticipates that the work required to meet its obligations under the Agreement is consistent with its other priorities. *Id*. ¶¶ 5, 7-8. Thus, Intervenors' position lacks legal and factual support.

Finally, Intervenors rely on a declaration submitted by the Service's Assistant Regional Director for Ecological Services, Region 1 in Portland, Oregon, in a case in which the Service recently sought an extension of a court-ordered deadline to complete a new listing determination for the streaked horned lark.[1] *See* Opp., Ex. 1. Intervenors characterize the declaration as demonstrating that the Service in general, and its Oregon Fish and Wildlife Office in particular, are suffering from "severe staffing shortages and an overwhelming workload" that make the Service's "discretionary revision" of the owl's critical habitat inappropriate. Opp. at 8-9. Like the owl, the streaked horned lark already is listed as a threatened species. Determination for the Taylor's Checkerspot Butterfly & Threatened Status for the Streaked Horned Lark, 78 Fed. Reg. 61452 (Oct. 3, 2013). Reviewing the critical habitat designation for the owl will have minimal impact on the work for the streaked horned lark listing determination because these efforts involve different staff in the Oregon Fish and Wildlife Office. *See* Exhibit C (Decl. of J. Tirpak ¶ 7). At this time, the Service anticipates that the work required to meet its obligations under the Agreement is consistent with its other priorities. *Id*. ¶ 8. Thus, even if the Court were inclined to wade into

---

[1] The declaration was submitted in *Center for Biological Diversity. v. Burgum*, Case No. 3:23-cv-00150-AN, Dkt. 47 (D. Or. May 1, 2026). The Center for Biological Diversity opposed the Service's motion for extension of time, and the matter is pending. *See id.,* Dkt. 49 (D. Or. May 15, 2026).

the details of the Service's various undertakings and allocation of resources, which the applicable standard of review does not invite, the facts here do not support Intervenors' argument. The Agreement is particularly reasonable because the alternative to agreeing to a timeline for completing consideration of the owl's critical habitat designation—a process already underway—is active litigation that would divert additional Service resources away from implementing the ESA. *See infra*, 13.

While Intervenors criticize the Service for seeking an extension of the deadline for the streaked horned lark listing determination, the Agreement contains a similar provision to allow the Service to move the Court to extend its deadlines for good cause. Agreement ¶ 4. If parties to other lawsuits oppose the Service's request to extend deadlines in those cases, then they can oppose them (as they have done in the litigation involving the streaked horned lark). But Intervenors do not cite a single case to support the unfounded legal theory that an intervenor can object to a settlement agreement in one lawsuit because it does not like a party's legitimate request for relief (i.e., an extension of a court-ordered deadline) in an entirely different lawsuit.

In short, Intervenors ask the Court to impose their judgment as to how they would resolve this case. The Court should decline to do so. The Agreement is "reasonable from an objective point of view[,]" *District of Columbia*, 933 F. Supp. at 51, and the Court thus should find that it is appropriate.

### C.     The Agreement Is In The Public Interest.

Throughout their brief, Intervenors argue that the Agreement does not further the objectives of the ESA and so it is not in the public interest. *E.g.*, Opp. at 2, 4, 5. Their argument, however, ignores the facts and the law.

First, as explained, the critical habitat designation set forth in the November 2021 final rule remains in place now and will remain in place unless and until the Service makes a final determination to revise it. Shultz Decl. ¶ 6. Intervenors complain that the owl faces ongoing loss of habitat and that the Service has been unable to consider whether the owl should be uplisted from threatened to endangered "due to limited resources and a strained workload[.]" Opp. at 10. But the owl has been afforded most of the protections of an endangered species as identified in 50 C.F.R. § 17.31 since it was listed as a threatened species in 1990. *See* 55 Fed. Reg. at 26193; *see also* 12-Month Finding for the Owl, 85 Fed. Reg. 81144, 81152 (Dec. 15, 2020). As the Service noted in 2020, reclassification will not provide any additional protection for the species, as it already receives the protections of the provisions of 50 C.F.R. § 17.21 for endangered wildlife. 85 Fed. Reg. at 81152.

Citing a series of Federal Register notices, Intervenors argue that "federal efforts to conserve the owl are currently in jeopardy." Opp. at 10. But the actions under consideration by the Bureau of Land Management and the U.S. Forest Service identified by Intervenors are in the early stages of consideration and ultimately will be subject to public-facing comment processes under the relevant statutes, as well as compliance with the ESA. Just as Intervenors will have the opportunity to participate in the public notice and comment process on any revisions to the November 2021 final rule, they (and the public writ large) will have the opportunity to make their views known to those other agencies on those potential decisions at the appropriate time. *See Citizens for a Better Env't*, 718 F.2d at 1121 (non-settling intervenors' interests were protected because they could influence the content of the proposed regulations by participating in the rulemaking process and then challenge the legality of the final rule in court).

Intervenors also argue that the ESA's conservation objectives should take precedence over the "deregulatory action" that could result from the Service's revision of the critical habitat designation. Opp. at 1, 9. Intervenors apparently view listing species and designating critical habitat as more aligned with "the ESA's overall goal of species preservation," *Bennett v. Spear*, 520 U.S. 154, 176-77 (1997), than revising critical habitat designations. But Intervenors ignore that the Supreme Court has made clear that "another objective" of the ESA is to ensure against "needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives," and that the statute should "not be implemented haphazardly, on the basis of speculation or surmise." *Id*. The ESA expressly requires the Service to take economic impacts into account when designating critical habitat. *E.g.*, *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 24 (2018); *Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp. 2d 1156, 1182 (D.N.M. 2000) (describing economic considerations as "an essential ingredient of critical habitat determinations" (citation omitted)), *aff'd* 294 F.3d 1220 (10th Cir. 2002). And the statute expressly permits the Service to revise a critical habitat determination "from time-to-time . . . as appropriate." 16 U.S.C. § 1533(a)(3)(A)(ii). When a statute uses such "broad and open-ended terms like . . . 'appropriate,' the terms 'afford agencies broad policy discretion.'" *Vanda Pharms., Inc. v. FDA*, 436 F. Supp. 3d 256, 274 (D.D.C. 2020) (citation omitted). Thus, Intervenors are plainly wrong in arguing that the Agreement's requirement that the Service reconsider the owl's critical habitat designation is inconsistent with the ESA's statutory objectives, particularly given that the Agreement does not commit the Service to any particular outcome. Agreement ¶ 9.

Most importantly, there is another significant public interest at play. Intervenors never acknowledge the underlying impetus for the Agreement: Plaintiffs filed a lawsuit against the

Service.  The parties have two options:  resolve the lawsuit via the Agreement, as they are attempting to do here, or engage in litigation.  Public policy strongly favors the former option: settlement agreements are to be upheld whenever possible.  *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 176 (D.D.C. 2007), *aff'd,* No. 07-5328, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008); *see Am. Sec. Vanlines, Inc. v. Gallagher*, 782 F.2d 1056, 1060 (D.C. Cir. 1986) (per curiam).  For the Service, the latter option would require a substantial amount of the Service's time and resources, a fact that at least one court has recognized as grounds for rejecting a challenge to a settlement agreement.  *E.g.*, *Conservation Law Found. v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993) (affirming denial of motion to vacate consent decree because, among other reasons, it would "save limited agency resources that would have been wasted on discovery, compiling an administrative record, and protracted litigation").  Thus, while Intervenors repeatedly point to the Service's limited resources and significant reductions in staff over the last eighteen months as reasons why the Court should not approve the Agreement, Opp. at 7-8, this argument is short-sighted.  Continued litigation would drain the Service's resources and its staff's time.  That outcome is at odds with black letter law that favors voluntary settlement of civil litigation.  *Autera*, 419 F.2d at 1199; *see Am. Sec. Vanlines, Inc.*, 782 F.2d at 1060.  For this reason, one party should not be able to preclude the other parties from settling their own disputes and minimizing the financial and other costs of litigation.  *Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 528-29 (1986).  Intervenors may "air [their] objections to the reasonableness of the decree," but they cannot veto a settlement agreement that imposes no duties or obligations on them, does not dispose of any independent claims by them, and does not limit their ability to participate in subsequent public process and challenge any subsequent final rule.  *Id.* at 529; *Citizens for a Better Env't*, 718 F.2d at 1121-22, 1130 (affirming district court's entry of consent decree where

intervenors "would be free to influence the content of the proposed regulations by participating in the rulemaking proceedings and then could attack the legality of any final regulations in court."); *Am. Nurses Ass'n v. Jackson*, No. 08-2198, 2010 WL 1506913, at *1-2 (D.D.C. Apr. 15, 2010) (approving EPA consent decree over intervenor-defendant's objections where decree set rulemaking deadlines and noting that intervenor could challenge EPA's final rule).

Indeed, at least one of the Intervenors has previously entered into settlement agreements that required the Service to meet deadlines for making listing determinations and other ESA actions. Courts have rejected objections to those agreements where "the settlements simply require the agency to render a final listing decision—warranted or not-warranted—using a specific timeline, without dictating the agency's substantive judgment." *Nat'l Ass'n of Home Builders v. U.S. Fish & Wildlife Serv.*, 786 F.3d 1050, 1053 (D.C. Cir. 2015) (rejecting challenge to agreement between the Service and Center for Biological Diversity where the agreement imposed deadlines for submitting findings for 251 candidate species); *In re ESA Section 4 Deadline Litig.*, 704 F.3d 972, 978-80 (D.C. Cir. 2013) (rejecting effort to intervene in lawsuit by Center for Biological Diversity and WildEarth Guardians that resulted in court-approved settlement agreements that set schedules for listing determinations); *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1164 (9th Cir. 2012) (rejecting challenge to settlement agreement between Center for Biological Diversity and National Marine Fisheries Service by intervenor where the settlement required the agency to issue a new biological opinion and accompanying incidental take statement within specified time period). These facts demonstrate that the Intervenors' objection to a deadline settlement that likewise leaves agency discretion intact is meritless.

The law thus disfavors Intervenors' clear preference for litigation. *Dist. of Columbia*, 933 F. Supp. at 51 (stating that it is not the intervenor's right to have the case decided in the manner it

13

prefers).  The Court should uphold the public policy favoring settlements and reject Intervenors' efforts to veto the Agreement.

**D.     The Agreement Is Appropriately Styled As An Order And Properly Requests The Court's Continued Jurisdiction.**

Intervenors appear to argue that the Agreement should be styled as an out-of-court settlement over which the Court would not retain jurisdiction.  *See* Opp. at 11-12.  With this suggestion, however, Intervenors seek to interfere impermissibly with the bargain that Plaintiffs and the Service structured after months of careful negotiation.  Indeed, an out-of-court settlement would shield the details of the Agreement from the Court, the public, and Intervenors themselves.

Nor is there merit to Intervenors' suggestion that Paragraph 5 of the Agreement, which provides that Plaintiffs will seek to hold their long-pending motion to enforce in abeyance, "weighs against court approval of the Agreement." *Id.* at 12.  Paragraph 5 acknowledges the separate ongoing litigation between many of the same parties.  It provides a measure that has the potential to coordinate a global resolution of the dispute, eliminate duplicative litigation, and relieve the Court of the burden of resolving a motion that has been pending for many years, ultimately conserving resources of the Court and the parties.

Finally, Intervenors contend that the Service "does not need a court-approved settlement to proceed with a rulemaking it has already begun." *Id*.  But the Agreement memorializes the Service's commitment to reach certain benchmarks in that process by specific dates and makes those dates enforceable, two bargained-for components of the Agreement.  Intervenors' efforts to excise these provisions from the Agreement have no legal basis and the Court should decline to do so.

## III.    CONCLUSION

Intervenors are trying to do what the law says they cannot: block a fairly negotiated, reasonable, and appropriate settlement agreement and force the Service and Plaintiffs to litigate this dispute.  The Agreement, however, is the result of good-faith negotiations and allows the Service to undertake a process that even Intervenors say the Service is "entitled" to carry out.  Opp. at 1.  Thus, the Agreement is procedurally and substantively fair, objectively reasonable, and appropriate.  Further, the Agreement's provisions to undertake a discretionary process pursuant to the procedures outlined in the ESA are consistent with the public interest and the highly favored public policy of resolving litigation.  The Court should grant the Joint Motion for Approval.

Dated: June 26, 2026                                    Respectfully submitted,

                                                        ADAM R.F. GUSTAFSON
                                                        Principal Deputy Assistant Attorney General
                                                        Environment & Natural Resources Division
                                                        NICOLE M. SMITH, Assistant Section Chief

                                                        /s/  Alison C. Finnegan
                                                        Alison C. Finnegan, Senior Trial Attorney
                                                        (Pennsylvania Bar No. 88519)
                                                        U.S. Department of Justice
                                                        Environment & Natural Resources Division
                                                        Wildlife & Marine Resources Section
                                                        Ben Franklin Station, P.O. Box 7611
                                                        Washington, D.C. 20044-7611
                                                        Tel: (202) 532-3312; Fax: (202) 305-0275
                                                        alison.c.finnegan@usdoj.gov

                                                        Attorneys for Defendants U.S. Fish and Wildlife
                                                        Service and Doug Burgum, in his official capacity
                                                        as Secretary, U.S. Department of the Interior

                                                        /s/       Tyler G. Welti (with permission)
                                                        TYLER G. WELTI (D.C. Bar No. 1015691)
                                                        VENABLE LLP
                                                        101 California Street, Suite 3800
                                                        San Francisco, CA 94111

15

415.653.3714
415.653.3755 (fax)
tgwelti@venable.com

Counsel for Plaintiffs, AMERICAN FOREST
RESOURCE COUNCIL; ASSOCIATION OF O&C
COUNTIES; DOUGLAS COUNTY, OREGON;
LEWIS COUNTY, WASHINGTON; SISKIYOU
COUNTY, CALIFORNIA; and SKAMANIA
COUNTY, WASHINGTON

16

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2026, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

/s/ Alison C. Finnegan